FILED ENTERED RECEIVED SERVED ON COUNSEL/PARTIES OF RECORD
MAR 04 2024
CLERK US DISTRICT COURT DISTRICT OF NEVADA
BY: DEPUTY

Jose DeCastro
1258 Franklin St.
Santa Monica, CA 90404
(310) 963-2445
chille@situationcreator.com

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| JOSE DECASTRO, Plaintiff, v. EVAN MCKNIGHT; PAM WAGNER; BRAD SPOLJARIC; JOHN CHAPMAN; CHANCE BLANKENSHIP; ROBERT FOUCH; LAWRENCE COUNTY COMMISSIONERS; CITY OF IRONTON OHIO; DOE GOVERNMENT ENTITY; and DOES 1 to 10 inclusive, Defendants. | Case No.: 2:24-cv-00435-DJA<br>**COMPLAINT**<br>(Claim of Unconstitutionality)<br>(Demand for Jury Trial)<br>**28 U.S. Code § 2403 Certification Requested by Clerk** RE O.R.C. 2911.21 |

**COMPLAINT**

1. Plaintiff Jose Maria DeCastro ("Plaintiff" or "I"), a member of the press who was investigating police corruption in Ironton Ohio, was recording police and peacefully protesting, in exercise of his first amendment rights, at the Ironton Ohio City Hall in the Lawrence County of Ohio. Defendants, under the guise of enforcing the city hall's business hours and disorderly conduct, after wrongfully denying Plaintiff a permit which Plaintiff protested against, without reasonable suspicion that Plaintiff was involved in any criminal activity, without probable cause of Plaintiff having violated a crime, and without a warrant, did interfere with and rob Plaintiff of his liberties while he was in a place that he was lawfully allowed to be, while Plaintiff was

performing constitutionally protected activities. The officers arrested, battered, handcuffed, searched Plaintiff and his possessions without a warrant, and seized and destroyed his property.

2. Sadly, the abusive treatment Plaintiff endured for merely asserting his rights and recording the police is not unusual or surprising. This civil rights action seeks to vindicate Plaintiff's constitutional and statutory rights and hold the officers and their departments accountable for biased policing practices and the policies (or absence of policies) that resulted in these practices.

## PARTIES

3. Plaintiff Jose Maria DeCastro is an adult over the age of eighteen, a member of the press, and a resident of Las Vegas, Nevada.

4. Defendant City of Ironton Ohio ("Ironton") is a municipal corporation, a body politic which may be sued. Ironton Police Department ("IPD") is a department of the City of Ironton Ohio created under Chapter 238 of Ironton, OH Code of Ordinances. Defendant Ironton at all times relevant hereto, operated, oversaw, and managed employees Pam Wagner, Brad Spoljaric, Chance Blankenship, Evan McKnight, Robert Fouch, and Does 1 to 7.

5. Defendant Lawrence County Commissioners ("Lawrence County") operate and govern the Lawrence County Sheriff's Office ("Sheriff") and the Lawrence County Jail ("Jail") under the color of state law and may be sued under Ohio Rev. Code § 305.12. Defendant Lawrence County at all times relevant hereto, operated, oversaw, and managed employees John Chapman and Does 9 to 10.

6. Defendant Evan McKnight ("McKnight") is, and at all relevant times was, an officer with the IPD. In doing the things herein alleged, McKnight was acting under the color of state law and in the course and scope of his employment with Ironton. McKnight is sued in his

performing constitutionally protected activities. The officers arrested, battered, handcuffed, searched Plaintiff and his possessions without a warrant, and seized and destroyed his property.

2. Sadly, the abusive treatment Plaintiff endured for merely asserting his rights and recording the police is not unusual or surprising. This civil rights action seeks to vindicate Plaintiff's constitutional and statutory rights and hold the officers and their departments accountable for biased policing practices and the policies (or absence of policies) that resulted in these practices.

## PARTIES

3. Plaintiff Jose Maria DeCastro is an adult over the age of eighteen, a member of the press, and a resident of Las Vegas, Nevada.

4. Defendant City of Ironton Ohio ("Ironton") is a municipal corporation, a body politic which may be sued. Ironton Police Department ("IPD") is a department of the City of Ironton Ohio created under Chapter 238 of Ironton, OH Code of Ordinances. Defendant Ironton at all times relevant hereto, operated, oversaw, and managed employees Pam Wagner, Brad Spoljaric, Chance Blankenship, Evan McKnight, Robert Fouch, and Does 1 to 7.

5. Defendant Lawrence County Commissioners ("Lawrence County") operate and govern the Lawrence County Sheriff's Office ("Sheriff") and the Lawrence County Jail ("Jail") under the color of state law and may be sued under Ohio Rev. Code § 305.12. Defendant Lawrence County at all times relevant hereto, operated, oversaw, and managed employees John Chapman and Does 9 to 10.

6. Defendant Evan McKnight ("McKnight") is, and at all relevant times was, an officer with the IPD. In doing the things herein alleged, McKnight was acting under the color of state law and in the course and scope of his employment with Ironton. McKnight is sued in his

individual capacity.

7. Defendant Brad Spoljaric ("Spoljaric") is, and at all relevant times was, an officer with the IPD. In doing the things herein alleged, Spoljaric was acting under the color of state law and in the course and scope of his employment with Ironton. Spoljaric is sued in his individual capacity.

8. Defendant Chance Blankenship ("Blankenship") is, and at all relevant times was, an officer with the IPD. In doing the things herein alleged, Blankenship was acting under the color of state law and in the course and scope of his employment with Ironton. Blankenship is sued in his individual capacity.

9. Defendant Robert Fouch ("Fouch") is, and at all relevant times was, an officer with the IPD. In doing the things herein alleged, Fouch was acting under the color of state law and in the course and scope of his employment with Ironton. Fouch is sued in his individual capacity.

10. Defendant Pam Wagner ("Wagner") is, and at all relevant times was, a supervisor with the IPD. In doing the things herein alleged, Wagner was acting under color of state law and in the course and scope of her employment with Ironton. Wagner is sued in her individual capacity, including in her capacity as a supervisor.

11. Defendant John Chapman ("Chapman") is, and at all relevant times was, a supervisor with the Sheriff's department. In doing the things herein alleged, Chapman was acting under color of state law and in the course and scope of his employment with Lawrence County. Chapman is sued in his individual capacity.

12. Doe #1 is believed to be an employee of either the Ironton Municipal Court or Lawrence County Court or Lawrence County Court of Common Pleas, possibly a clerk, and possibly with the first name of Samantha ("Samantha"). Samantha can only be identified as the

individual capacity.

7. Defendant Brad Spoljaric ("Spoljaric") is, and at all relevant times was, an officer with the IPD. In doing the things herein alleged, Spoljaric was acting under the color of state law and in the course and scope of his employment with Ironton. Spoljaric is sued in his individual capacity.

8. Defendant Chance Blankenship ("Blankenship") is, and at all relevant times was, an officer with the IPD. In doing the things herein alleged, Blankenship was acting under the color of state law and in the course and scope of his employment with Ironton. Blankenship is sued in his individual capacity.

9. Defendant Robert Fouch ("Fouch") is, and at all relevant times was, an officer with the IPD. In doing the things herein alleged, Fouch was acting under the color of state law and in the course and scope of his employment with Ironton. Fouch is sued in his individual capacity.

10. Defendant Pam Wagner ("Wagner") is, and at all relevant times was, a supervisor with the IPD. In doing the things herein alleged, Wagner was acting under color of state law and in the course and scope of her employment with Ironton. Wagner is sued in her individual capacity, including in her capacity as a supervisor.

11. Defendant John Chapman ("Chapman") is, and at all relevant times was, a supervisor with the Sheriff's department. In doing the things herein alleged, Chapman was acting under color of state law and in the course and scope of his employment with Lawrence County. Chapman is sued in his individual capacity.

12. Doe #1 is believed to be an employee of either the Ironton Municipal Court or Lawrence County Court or Lawrence County Court of Common Pleas, possibly a clerk, and possibly with the first name of Samantha ("Samantha"). Samantha can only be identified as the

person making the defamatory statement about Plaintiff by telephone to Darin Haberkorn on April 1, 2022 who identified herself as "Samantha at the Clerk of Courts". Plaintiff will amend this complaint to show the true name and capacity of Samantha if and when the same are ascertained. Doe #8 is believed to be Samantha's supervisor.

13. Doe Government Entity is the employer of Doe #1 and Doe #8. Most likely to be the Ironton Municipal Court created under Ohio Rev. Code §§ 1907.01 through 1907.57 or Lawrence County Court created under Ohio Rev. Code §§ 1901.44 through 1901.44. Both of which are created not under the Ohio Constitution, but under statute, and can be sued. Doe Government Entity may also be Lawrence County Court of Common Pleas, which has Eleventh Amendment immunity from suit. Plaintiff is not suing the State of Ohio.

14. The true names and capacities, whether individual, corporate, associate, or otherwise, of Defendants sued herein as Does 1-10, inclusive, are unknown to Plaintiff, who therefore sues said defendants by such fictitious names. Plaintiff will amend this Complaint to show the true names and capacities if and when the same are ascertained. Plaintiff is informed and believes, and thereon alleges, that said Defendants, and each of them, are responsible in some manner for Plaintiff's damages as herein alleged. Each reference in this complaint to "defendant", "defendants", "Defendants", or a specifically named defendant also refers to all "Doe" defendants. Any reference to "Police" includes IPD and officers of the Sheriff's office.

15. Plaintiff is informed and believes and thereon alleges that each of the Defendants sued herein was negligently, wrongfully, and otherwise responsible in some manner for the events and happenings as hereinafter described, and proximately caused injuries and damages to Plaintiff. Further, one or more Doe Defendants was at all material times responsible for the hiring, training, supervision, and discipline of other defendants, including the individually named and

person making the defamatory statement about Plaintiff by telephone to Darin Haberkorn on April 1, 2022 who identified herself as "Samantha at the Clerk of Courts". Plaintiff will amend this complaint to show the true name and capacity of Samantha if and when the same are ascertained. Doe #8 is believed to be Samantha's supervisor.

13. Doe Government Entity is the employer of Doe #1 and Doe #8. Most likely to be the Ironton Municipal Court created under Ohio Rev. Code §§ 1907.01 through 1907.57 or Lawrence County Court created under Ohio Rev. Code §§ 1901.44 through 1901.44. Both of which are created not under the Ohio Constitution, but under statute, and can be sued. Doe Government Entity may also be Lawrence County Court of Common Pleas, which has Eleventh Amendment immunity from suit. Plaintiff is not suing the State of Ohio.

14. The true names and capacities, whether individual, corporate, associate, or otherwise, of Defendants sued herein as Does 1-10, inclusive, are unknown to Plaintiff, who therefore sues said defendants by such fictitious names. Plaintiff will amend this Complaint to show the true names and capacities if and when the same are ascertained. Plaintiff is informed and believes, and thereon alleges, that said Defendants, and each of them, are responsible in some manner for Plaintiff's damages as herein alleged. Each reference in this complaint to "defendant", "defendants", "Defendants", or a specifically named defendant also refers to all "Doe" defendants. Any reference to "Police" includes IPD and officers of the Sheriff's office.

15. Plaintiff is informed and believes and thereon alleges that each of the Defendants sued herein was negligently, wrongfully, and otherwise responsible in some manner for the events and happenings as hereinafter described, and proximately caused injuries and damages to Plaintiff. Further, one or more Doe Defendants was at all material times responsible for the hiring, training, supervision, and discipline of other defendants, including the individually named and

Doe Defendants.

16. Plaintiff is informed and believes and thereon alleges that at all times herein mentioned each of the Defendants, including all defendants sued under fictitious names, was the agent and/or employee of each of the other Defendants, and in doing the things hereinafter alleged was acting within the course and scope of such agency and employment.

17. Plaintiff is informed and believes, and thereon alleges, that each of the Defendants was at all material times an agent, servant, employee, partner, joint venturer, co-conspirator, an/or alter ego of the remaining Defendants, and in doing the things herein alleged, was acting within the course and scope of that relationship. Plaintiff is further informed and believes, and thereon alleges, that each of the Defendants herein gave consent, aid, and assistance to each of the remaining Defendants, and ratified and/or authorized the acts or omissions of each Defendant as alleged herein, except as may be hereinafter otherwise specifically alleged. At all material times, each Defendant was an integral participant, jointly engaged in constitutionally violative, unlawful, and/or tortious activity, resulting in the deprivation of Plaintiff's constitutional rights and other actionable harm.

**JURISDICTION AND VENUE**

18. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3)-(4) because it arises under the Constitution and laws of the United States, as it is being brought to obtain compensatory and punitive damages for the deprivation, under color of state law, of the rights of a citizen of the United States that are secured by the United States Constitution, pursuant to 42 U.S.C. §§ 1981, 1983, 1985, and 1988. This Court has supplemental jurisdiction over the claims arising under Ohio, Nevada, and Common law pursuant to 28 U.S.C § 1367(a). Claims for federal law violations also fall within the jurisdiction of this Court.

Doe Defendants.

16. Plaintiff is informed and believes and thereon alleges that at all times herein mentioned each of the Defendants, including all defendants sued under fictitious names, was the agent and/or employee of each of the other Defendants, and in doing the things hereinafter alleged was acting within the course and scope of such agency and employment.

17. Plaintiff is informed and believes, and thereon alleges, that each of the Defendants was at all material times an agent, servant, employee, partner, joint venturer, co-conspirator, an/or alter ego of the remaining Defendants, and in doing the things herein alleged, was acting within the course and scope of that relationship. Plaintiff is further informed and believes, and thereon alleges, that each of the Defendants herein gave consent, aid, and assistance to each of the remaining Defendants, and ratified and/or authorized the acts or omissions of each Defendant as alleged herein, except as may be hereinafter otherwise specifically alleged. At all material times, each Defendant was an integral participant, jointly engaged in constitutionally violative, unlawful, and/or tortious activity, resulting in the deprivation of Plaintiff's constitutional rights and other actionable harm.

**JURISDICTION AND VENUE**

18. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3)-(4) because it arises under the Constitution and laws of the United States, as it is being brought to obtain compensatory and punitive damages for the deprivation, under color of state law, of the rights of a citizen of the United States that are secured by the United States Constitution, pursuant to 42 U.S.C. §§ 1981, 1983, 1985, and 1988. This Court has supplemental jurisdiction over the claims arising under Ohio, Nevada, and Common law pursuant to 28 U.S.C § 1367(a). Claims for federal law violations also fall within the jurisdiction of this Court.

Additionally, this court has federal diversity jurisdiction under 28 U.S.C. § 1332. The amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and there is complete diversity of citizenship between the parties.

19. This Court is the proper venue pursuant to 28 U.S.C. §§ 1391(b)(2-3) because the defamatory conduct of defendants outside of this forum has reached potential customers of Plaintiff in this forum. The defamatory conduct of defendants was targeted at law enforcement personnel in this forum for the purpose of injuring Plaintiff in this forum. Plaintiff has suffered economic harm in this forum. Defendants operate a criminal syndicate giving this court jurisdiction under Nev. Rev. Stat. § 14.065 and Nev. Rev. Stat. § 207.400 and 18 U.S.C. § 1965 (b).

## GENERAL FACTUAL ALLEGATIONS

20. The majority of the factual allegations were broadcast to YouTube, for transparency of my investigation of government corruption in the city of Ironton Ohio. Where I report actions of entities, I leave out accidental actions. All actions are therefore alleged to be deliberate. Where actions harm others, they are alleged to be with malice and through the totality of the circumstances it is proven. At all times, defendants lacked qualified immunity or other privileges. Plaintiff hereby makes the following factual allegations:

21. **March 21, 2022.** I headed to Ironton Ohio to investigate claims by Sarah Page ("Page") that she had been stalked and had her rights violated repeatedly for multiple years by Police in retaliation for Page accusing McKnight of stealing a wallet.

22. I visited the IPD station and talked to Wagner about the harassment of Page and to file a complaint. Wagner admitted to having viewed the videos of Page's incident. Wagner asked me to leave and she walked away.

Additionally, this court has federal diversity jurisdiction under 28 U.S.C. § 1332. The amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and there is complete diversity of citizenship between the parties.

19. This Court is the proper venue pursuant to 28 U.S.C. §§ 1391(b)(2-3) because the defamatory conduct of defendants outside of this forum has reached potential customers of Plaintiff in this forum. The defamatory conduct of defendants was targeted at law enforcement personnel in this forum for the purpose of injuring Plaintiff in this forum. Plaintiff has suffered economic harm in this forum. Defendants operate a criminal syndicate giving this court jurisdiction under Nev. Rev. Stat. § 14.065 and Nev. Rev. Stat. § 207.400 and 18 U.S.C. § 1965 (b).

## GENERAL FACTUAL ALLEGATIONS

20. The majority of the factual allegations were broadcast to YouTube, for transparency of my investigation of government corruption in the city of Ironton Ohio. Where I report actions of entities, I leave out accidental actions. All actions are therefore alleged to be deliberate. Where actions harm others, they are alleged to be with malice and through the totality of the circumstances it is proven. At all times, defendants lacked qualified immunity or other privileges. Plaintiff hereby makes the following factual allegations:

21. **March 21, 2022.** I headed to Ironton Ohio to investigate claims by Sarah Page ("Page") that she had been stalked and had her rights violated repeatedly for multiple years by Police in retaliation for Page accusing McKnight of stealing a wallet.

22. I visited the IPD station and talked to Wagner about the harassment of Page and to file a complaint. Wagner admitted to having viewed the videos of Page's incident. Wagner asked me to leave and she walked away.

23. Shortly after, I went to the Ironton Municipal Court where I was battered by court officer Mark Harmon and court officer Rick Robinson who threatened to arrest me if I didn't leave a public area because I was somehow interfering with what was going on in an adjacent room. John Doe officer refused to identify himself. Three other employees refused to provide John Doe's name, including Judge Kevin Waldo ("Waldo"). Before being elected as the judge of the municipal court, Waldo was the assistant prosecuting attorney for Lawrence County and Ironton City Council member.

24. Shortly after, in the IPD parking lot, Page asked Wagner for complaint forms. Wagner again refused to take a complaint, lied that there were complaint forms on the IPD website, and said, "If you moved forward with a false police report, you can be prosecuted for it." (As of the date of this complaint, there are still no complaint forms available on the IPD website.)

25. **March 22, 2022.** I returned to the Ironton Municipal court to talk to Waldo about the corruption of his Police. On the way in, I verbally confronted Fouch for violating people's rights, as he was one of the ones harassing Page. Fouch and I discussed meeting at the gym for a wrestling match.

26. After leaving my meeting with Waldo, I stopped for coffee where I spoke to a citizen and told him that I wanted to talk to people who had issues with the IPD. The citizen said that it would not be hard to find people out on the street who have complaints about the IPD.

27. Later, I verbally confronted McKnight outside of the IPD station, for stealing Page's wallet. I confronted one of the Blankenships (there are two at the IPD), asking if it was true that his father was a drug dealer, and asked McKnight if he'd blinded mail carrier Teresa Ward ("Ward"), referring to when he had illegally pepper sprayed Ward, which still affects her vision. I also had a chance to ask Wagner if she was going to watch my video premiere of Page's story,

23. Shortly after, I went to the Ironton Municipal Court where I was battered by court officer Mark Harmon and court officer Rick Robinson who threatened to arrest me if I didn't leave a public area because I was somehow interfering with what was going on in an adjacent room. John Doe officer refused to identify himself. Three other employees refused to provide John Doe's name, including Judge Kevin Waldo ("Waldo"). Before being elected as the judge of the municipal court, Waldo was the assistant prosecuting attorney for Lawrence County and Ironton City Council member.

24. Shortly after, in the IPD parking lot, Page asked Wagner for complaint forms. Wagner again refused to take a complaint, lied that there were complaint forms on the IPD website, and said, "If you moved forward with a false police report, you can be prosecuted for it." (As of the date of this complaint, there are still no complaint forms available on the IPD website.)

25. **March 22, 2022.** I returned to the Ironton Municipal court to talk to Waldo about the corruption of his Police. On the way in, I verbally confronted Fouch for violating people's rights, as he was one of the ones harassing Page. Fouch and I discussed meeting at the gym for a wrestling match.

26. After leaving my meeting with Waldo, I stopped for coffee where I spoke to a citizen and told him that I wanted to talk to people who had issues with the IPD. The citizen said that it would not be hard to find people out on the street who have complaints about the IPD.

27. Later, I verbally confronted McKnight outside of the IPD station, for stealing Page's wallet. I confronted one of the Blankenships (there are two at the IPD), asking if it was true that his father was a drug dealer, and asked McKnight if he'd blinded mail carrier Teresa Ward ("Ward"), referring to when he had illegally pepper sprayed Ward, which still affects her vision. I also had a chance to ask Wagner if she was going to watch my video premiere of Page's story,

and Wagner said, "I don't do videos."

28. After my video premier on Page, eleven people reached out to me with complaints about the IPD, with the majority of the complaints being about McKnight, followed by Wagner, and then a Blankenship and Fouch. The majority of the complaints were about pretextual stops and excessive force. Many victims of the IPD had scars on their wrists and suffered neuropathy from abusive handcuff procedures. Additionally, the majority of them were afraid of further retaliation and wanted me not to reveal their names. There are also many complaints about misdemeanor arrests. At the Jail, there are numerous complaints about illegal body cavity searches without reasonable suspicion, overcrowding, and unnecessary violence from guards and prisoners. There was a significant number of people mentioning the phrase "squat and cough" in relation to body cavity searches. The Ironton Tribune interviewed Sheriff Tim Sexton in 2005, who admitted to overcrowding, and that the jail was originally built to house only 52 inmates.

29. **March 23, 2022.** I went with Page to file a complaint with the Sheriff about the violation of Page's civil rights. We met with Sheriff Jeff Lawless ("Lawless"), who was also the previous warden at the jail. At this time, I'd communicated with approximately 50 people who had similar stories of their rights being violated by the IPD.

30. Later, I published interviews with two victims of the IPD. The abuses by the IPD included excessive force and illegal seizure. I also interviewed Chance Blakenship's own brother, Derik, whom Branden Blankenship arrested.

31. In the evening, I published an interview with a victim of Jason Newman. Newman is an officer at the Sheriff's office. The victim has filed a civil rights lawsuit.

32. **March 24, 2022.** I published interviews of two victims of McKnight and a Blankenship. Also, an interview with a family member of Larry Kinstler. Kinstler filed a civil

and Wagner said, "I don't do videos."

28. After my video premier on Page, eleven people reached out to me with complaints about the IPD, with the majority of the complaints being about McKnight, followed by Wagner, and then a Blankenship and Fouch. The majority of the complaints were about pretextual stops and excessive force. Many victims of the IPD had scars on their wrists and suffered neuropathy from abusive handcuff procedures. Additionally, the majority of them were afraid of further retaliation and wanted me not to reveal their names. There are also many complaints about misdemeanor arrests. At the Jail, there are numerous complaints about illegal body cavity searches without reasonable suspicion, overcrowding, and unnecessary violence from guards and prisoners. There was a significant number of people mentioning the phrase "squat and cough" in relation to body cavity searches. The Ironton Tribune interviewed Sheriff Tim Sexton in 2005, who admitted to overcrowding, and that the jail was originally built to house only 52 inmates.

29. **March 23, 2022.** I went with Page to file a complaint with the Sheriff about the violation of Page's civil rights. We met with Sheriff Jeff Lawless ("Lawless"), who was also the previous warden at the jail. At this time, I'd communicated with approximately 50 people who had similar stories of their rights being violated by the IPD.

30. Later, I published interviews with two victims of the IPD. The abuses by the IPD included excessive force and illegal seizure. I also interviewed Chance Blakenship's own brother, Derik, whom Branden Blankenship arrested.

31. In the evening, I published an interview with a victim of Jason Newman. Newman is an officer at the Sheriff's office. The victim has filed a civil rights lawsuit.

32. **March 24, 2022.** I published interviews of two victims of McKnight and a Blankenship. Also, an interview with a family member of Larry Kinstler. Kinstler filed a civil

rights lawsuit against the county after being beaten and choked in the Jail by guards. Kinstler won the suit and suspiciously died a few days later.

33. Deputy Jeremy Hanshaw ("Hanshaw") is famous for being indicted by the DOJ for being captured on video choking the above-mentioned Kinstler at the Jail. After being found innocent of the criminal charges, Hanshaw was placed as the resource officer at Ironton High School. Lawless said because of the union agreement, he had to return Hanshaw to work since he was found innocent. However, one of Hanshaw's co-defendants was terminated because he hadn't been a deputy long enough to have union protection. The deputy fired contributed far less to the abuse than Hanshaw.

34. Another victim was a high school kid who had been sleeping in front of the school in his truck. Hanshaw did a wellness check on him which included forcing the victim's truck door open and when the victim grabbed for his phone to record the incident, Hanshaw "double-handed choked" the victim over his center console, pulled him out of the car, handcuffed him and arrested him. The high school kid was strip-searched at the jail.

35. I also interviewed the family members of a victim who was tased and beaten by McKnight and a Blankenship. The family members had recorded the beating, but Wagner was called to the family's house, where Wagner demanded the family members delete the recordings or they would have their devices taken, after which the family members did delete the recordings.

36. A victim was arrested on his own property, without a warrant, for openly carrying a firearm by Hanshaw, who said "I hate you wannabee YouTube stars."

37. I interviewed a woman who spat her long hair out of her mouth while being processed at the county jail which resulted in a Spoljaric choking her until a female employee named Joy at

rights lawsuit against the county after being beaten and choked in the Jail by guards. Kinstler won the suit and suspiciously died a few days later.

33. Deputy Jeremy Hanshaw ("Hanshaw") is famous for being indicted by the DOJ for being captured on video choking the above-mentioned Kinstler at the Jail. After being found innocent of the criminal charges, Hanshaw was placed as the resource officer at Ironton High School. Lawless said because of the union agreement, he had to return Hanshaw to work since he was found innocent. However, one of Hanshaw's co-defendants was terminated because he hadn't been a deputy long enough to have union protection. The deputy fired contributed far less to the abuse than Hanshaw.

34. Another victim was a high school kid who had been sleeping in front of the school in his truck. Hanshaw did a wellness check on him which included forcing the victim's truck door open and when the victim grabbed for his phone to record the incident, Hanshaw "double-handed choked" the victim over his center console, pulled him out of the car, handcuffed him and arrested him. The high school kid was strip-searched at the jail.

35. I also interviewed the family members of a victim who was tased and beaten by McKnight and a Blankenship. The family members had recorded the beating, but Wagner was called to the family's house, where Wagner demanded the family members delete the recordings or they would have their devices taken, after which the family members did delete the recordings.

36. A victim was arrested on his own property, without a warrant, for openly carrying a firearm by Hanshaw, who said "I hate you wannabee YouTube stars."

37. I interviewed a woman who spat her long hair out of her mouth while being processed at the county jail which resulted in a Spoljaric choking her until a female employee named Joy at

the jail told him to stop, shortly before the woman passed out. The woman was arrested for being the victim of a domestic violence complaint and the charges were dropped before her first hearing. At another time the same woman was arrested for an out-of-date warrant even though the woman had evidence that the warrant had been quashed. This woman is one of the victims with scars on her wrists and neuropathy.

38. I heard from parents that were pulled over by McKnight for "leaving a known drug area". Multiple times McKnight pulled the couple over, and he asked the passenger for a driver's license each time. One time, their front door was kicked in by the Police for a bench warrant on one of the parents, the officers pointed their weapons at the other parent and said that the couple "have no rights".

I also heard from citizens who claimed the Police were corrupt and confiscating drugs for their own use. This was later proven when IPD officer Brad Spoljaric admitted to doing this.

39. I interviewed a first cousin of the Blankenship officer brothers who said that officers of the IPD are bringing women to the IPD station and having sex with them to have tickets dropped. The officers named by this man were McKnight and Hanshaw. This man also reported occasional overpopulation of the jail with over 100 inmates. He also said that after having an inmate use their hands to spread their butt cheeks and lift their scrotum, the inmate next has to put their dirty fingers in their mouth. This man also continues to be harassed and retaliated against because he started a Facebook page critical of the IPD. To corroborate this story, I also had a telephone interview with a person who reported that IPD officer Joe Akers ("Akers") had sex with an intoxicated woman who came to the IPD station to make a report.

40. By this time, I'd heard from over 100 citizens with complaints about police, county sheriffs, and corrections officers.

the jail told him to stop, shortly before the woman passed out. The woman was arrested for being the victim of a domestic violence complaint and the charges were dropped before her first hearing. At another time the same woman was arrested for an out-of-date warrant even though the woman had evidence that the warrant had been quashed. This woman is one of the victims with scars on her wrists and neuropathy.

38. I heard from parents that were pulled over by McKnight for "leaving a known drug area". Multiple times McKnight pulled the couple over, and he asked the passenger for a driver's license each time. One time, their front door was kicked in by the Police for a bench warrant on one of the parents, the officers pointed their weapons at the other parent and said that the couple "have no rights".

I also heard from citizens who claimed the Police were corrupt and confiscating drugs for their own use. This was later proven when IPD officer Brad Spoljaric admitted to doing this.

39. I interviewed a first cousin of the Blankenship officer brothers who said that officers of the IPD are bringing women to the IPD station and having sex with them to have tickets dropped. The officers named by this man were McKnight and Hanshaw. This man also reported occasional overpopulation of the jail with over 100 inmates. He also said that after having an inmate use their hands to spread their butt cheeks and lift their scrotum, the inmate next has to put their dirty fingers in their mouth. This man also continues to be harassed and retaliated against because he started a Facebook page critical of the IPD. To corroborate this story, I also had a telephone interview with a person who reported that IPD officer Joe Akers ("Akers") had sex with an intoxicated woman who came to the IPD station to make a report.

40. By this time, I'd heard from over 100 citizens with complaints about police, county sheriffs, and corrections officers.

41. Later, I was informed by multiple citizens that the Police were having a private meeting regarding my presence in the city at "The Armory".

42. Multiple people reported that the Ironton PD maintains a list of people that they harass.

43. **March 25, 2022.** WOWK-TV, the CBS channel 13 news in Ironton, reported "Ironton PD says that both Ironton High School and Ironton Elementary School are on a soft lockdown. They say the lockdown is due to a 'concerning' video from [Plaintiff] that was sent to a student or a parent." Later the same day, the news station confirmed with the school superintendent that the reporting was not accurate. No schools in the district were under lockdown. A reporter with WOWK-TV also confirmed with me that they found that I didn't send any video.

44. My reputation was harmed by this defamatory claim, including statements from school leaders saying that they were "hyper-aware" of my presence in the community. This report also led to my being harassed, including being threatened on the streets of Ironton by an angry parent. Yahoo Money picked up the false story by the Ironton Tribune, who never listed a retraction. Later the same day, WOWK-TV reported further false attacks on my character by the IPD, saying, "According to Ironton Police, a local restaurant closed out of safety concerns, and at least two other restaurants asked YouTuber Chille DeCastro to leave." This further harmed my reputation.

45. I went to the mayor's office and attempted to get a meeting with Mayor Sam Cramblit ("Cramblit") but was unable to. Cramblit's own father and paternal grandmother had both filed a § 1983 claim against the IPD in the 1990s. (While in Ironton, I would visit the Mayor's office almost daily to try to get an interview with Cramblit, but he always avoided me. At one time, he literally ran away from me and hid around a corner.)

46. I interviewed a woman that said she was raped by the Horsecreek Riders Motorcycle

41. Later, I was informed by multiple citizens that the Police were having a private meeting regarding my presence in the city at "The Armory".

42. Multiple people reported that the Ironton PD maintains a list of people that they harass.

43. **March 25, 2022.** WOWK-TV, the CBS channel 13 news in Ironton, reported "Ironton PD says that both Ironton High School and Ironton Elementary School are on a soft lockdown. They say the lockdown is due to a 'concerning' video from [Plaintiff] that was sent to a student or a parent." Later the same day, the news station confirmed with the school superintendent that the reporting was not accurate. No schools in the district were under lockdown. A reporter with WOWK-TV also confirmed with me that they found that I didn't send any video.

44. My reputation was harmed by this defamatory claim, including statements from school leaders saying that they were "hyper-aware" of my presence in the community. This report also led to my being harassed, including being threatened on the streets of Ironton by an angry parent. Yahoo Money picked up the false story by the Ironton Tribune, who never listed a retraction. Later the same day, WOWK-TV reported further false attacks on my character by the IPD, saying, "According to Ironton Police, a local restaurant closed out of safety concerns, and at least two other restaurants asked YouTuber Chille DeCastro to leave." This further harmed my reputation.

45. I went to the mayor's office and attempted to get a meeting with Mayor Sam Cramblit ("Cramblit") but was unable to. Cramblit's own father and paternal grandmother had both filed a § 1983 claim against the IPD in the 1990s. (While in Ironton, I would visit the Mayor's office almost daily to try to get an interview with Cramblit, but he always avoided me. At one time, he literally ran away from me and hid around a corner.)

46. I interviewed a woman that said she was raped by the Horsecreek Riders Motorcycle

Club, which works with the Blankenship family dealing drugs. When the woman went to file a report with the IPD, she was interviewed behind the station and warned not to file the report, or the motorcycle club would come for her family.

47. I interviewed a man who was arrested by Spoljaric for disorderly conduct for being annoyed and refusing to leave a public area after a "lawful order" to do so. Once in jail, the man was beaten up by the jailers, put in a restraint chair at the jail for several hours, and told to pee himself, which he did.

48. I tried to interview Blankenship and McKnight. Blankenship said, "No comment". McKnight tried to order me from the public street.

49. In the evening, I found Akers, of the IPD, dressed in civilian clothes and driving a Chevy pickup, following me around when I turned around and confronted him.

50. I interviewed Angela Ratcliff who was handcuffed and then tased in her back while in handcuffs, in her own porch. Ratcliff was one of many people who reported that when the Police show up for a domestic disturbance, they arrest everyone, not just the abuser. She had also been strip-searched in jail, even though she was arrested for domestic abuse and not drugs. Ratcliff's family member also told stories of being arrested and was one of many people who reported that when arrested in Ironton, the Police take cash that you're carrying and keep it.

52. **March 26, 2022.** A confidential informant called me and told me that the Blankenships planned on planting drugs on me and arresting me.

53. **March 27, 2022.** I Interviewed Eugune Aldridge who said the IPD barged into his house, looking for his brother. Aldridge was arrested for refusing to aid in the investigation and charged with felony harboring a fugitive. Aldridge was required to lay on his cuffs in the back of the car, causing bruising on his wrists. He was also strip-searched at the county jail. Aldridge

Club, which works with the Blankenship family dealing drugs. When the woman went to file a report with the IPD, she was interviewed behind the station and warned not to file the report, or the motorcycle club would come for her family.

47. I interviewed a man who was arrested by Spoljaric for disorderly conduct for being annoyed and refusing to leave a public area after a "lawful order" to do so. Once in jail, the man was beaten up by the jailers, put in a restraint chair at the jail for several hours, and told to pee himself, which he did.

48. I tried to interview Blankenship and McKnight. Blankenship said, "No comment". McKnight tried to order me from the public street.

49. In the evening, I found Akers, of the IPD, dressed in civilian clothes and driving a Chevy pickup, following me around when I turned around and confronted him.

50. I interviewed Angela Ratcliff who was handcuffed and then tased in her back while in handcuffs, in her own porch. Ratcliff was one of many people who reported that when the Police show up for a domestic disturbance, they arrest everyone, not just the abuser. She had also been strip-searched in jail, even though she was arrested for domestic abuse and not drugs. Ratcliff's family member also told stories of being arrested and was one of many people who reported that when arrested in Ironton, the Police take cash that you're carrying and keep it.

52. **March 26, 2022.** A confidential informant called me and told me that the Blankenships planned on planting drugs on me and arresting me.

53. **March 27, 2022.** I Interviewed Eugune Aldridge who said the IPD barged into his house, looking for his brother. Aldridge was arrested for refusing to aid in the investigation and charged with felony harboring a fugitive. Aldridge was required to lay on his cuffs in the back of the car, causing bruising on his wrists. He was also strip-searched at the county jail. Aldridge

was also directed to put his fingers in his mouth after using them to spread his butt cheeks and lift his scrotum, by the same officer that arrested him. Aldridge said that the jail was overcrowded with over 100 people in the jail. The police found his Aldridge's brother two days later, not in Aldridge's house. Aldridge was denied a jury trial and found guilty, mostly because the police report said that Aldridge had admitted to being guilty, which Aldridge hadn't done.

54. Spoljaric pulled his car up and pointed his headlights at me while I was parked at a gas station, to intimidate me. I verbally confronted him, and he admitted to maintaining a log of my location and activities.

55. I published an interview with Beth Rist, the first female police officer in Ironton. She witnessed Wagner unnecessarily kicking Jesse Johnson in the leg while he was sleeping outside. Rist had been hit in the back randomly by IPD Officer William Garland, for which she was offered a cash settlement. Rist witnessed IPD Officer Rich Atkins pull a handcuffed subject out of his patrol car and beat him for flicking a cigarette into the front seat. At the time, when Rist would report violations, she was told not to rock the boat. She was investigating a murder once, and while she was writing up the report, her fellow officers were rummaging through the house stealing guns and cash. Rist witnessed IPD Officer Chad Gue ("Gue") unnecessarily hit a subject in the back of the head to get the subject into the back of a car. IPD Officer Grover Carter would regularly steal guns from the evidence room, and it was common knowledge among the IPD.

56. **March 28, 2022.** I interviewed a citizen that told me the story of Carl Clutters. Clutters had died in Lawrence County Jail due to a subdural hematoma from hitting his head from being pushed into his cell by a guard. Clutters was also being denied his medication. Clutter's family sued for civil rights violations and won a settlement.

57. I interviewed a citizen who said he was arrested for using derogatory words about a

was also directed to put his fingers in his mouth after using them to spread his butt cheeks and lift his scrotum, by the same officer that arrested him. Aldridge said that the jail was overcrowded with over 100 people in the jail. The police found his Aldridge's brother two days later, not in Aldridge's house. Aldridge was denied a jury trial and found guilty, mostly because the police report said that Aldridge had admitted to being guilty, which Aldridge hadn't done.

54. Spoljaric pulled his car up and pointed his headlights at me while I was parked at a gas station, to intimidate me. I verbally confronted him, and he admitted to maintaining a log of my location and activities.

55. I published an interview with Beth Rist, the first female police officer in Ironton. She witnessed Wagner unnecessarily kicking Jesse Johnson in the leg while he was sleeping outside. Rist had been hit in the back randomly by IPD Officer William Garland, for which she was offered a cash settlement. Rist witnessed IPD Officer Rich Atkins pull a handcuffed subject out of his patrol car and beat him for flicking a cigarette into the front seat. At the time, when Rist would report violations, she was told not to rock the boat. She was investigating a murder once, and while she was writing up the report, her fellow officers were rummaging through the house stealing guns and cash. Rist witnessed IPD Officer Chad Gue ("Gue") unnecessarily hit a subject in the back of the head to get the subject into the back of a car. IPD Officer Grover Carter would regularly steal guns from the evidence room, and it was common knowledge among the IPD.

56. **March 28, 2022.** I interviewed a citizen that told me the story of Carl Clutters. Clutters had died in Lawrence County Jail due to a subdural hematoma from hitting his head from being pushed into his cell by a guard. Clutters was also being denied his medication. Clutter's family sued for civil rights violations and won a settlement.

57. I interviewed a citizen who said he was arrested for using derogatory words about a

police officer. He was subsequently denied his medication in jail and had a seizure as a result. All his money was also stolen. He was also beaten by guards while in a restraint chair and tased in the back while handcuffed. This man also said that his uncle was beaten by guards while in jail. Finally, this man was one of several who reported to me that guards pay inmates to beat up other inmates and the guards disable cell cameras to enable the beatings.

58. I interviewed a citizen who said her father had been arrested for possession of illegal drugs and is being confined in a rehab facility as a condition of bail. I heard from other citizens that Judge Waldo gives a similar post-conviction order.

59. I was told by several citizens that Waldo sends victims to rehab clinics that Judge Andy Ballard benefits from, and that Ballard sends victims to rehab clinics that Waldo benefits from. I was also told that commissioners, judges, and prosecutors benefit from the local rehab clinics.

60. I interviewed Donald Roberts, a relative of IPD officer Joe Akers, who felt above the law due to that association. I witnessed Roberts batter a colleague member of the press who was standing there filming. Roberts also assaulted me, threatening to murder me. I reported the incident to IPD Officer Steve Wilson. Roberts was not cited. This attack was the result of IPD and WOWK-TV's defamatory reporting.

61. There was a small group of Ironton citizens and IPD officers that did a "back the blue" rally in downtown Ironton, targeting me and my presence in town. This rally was additionally the result of IPD and WOWK-TV's defamatory reporting.

62. **March 29, 2022.** I published security camera footage showing Sheriff's Deputy Jonathan Spojaric, who was responding to a 911 call that Kent Freeman had made. Spoljaric pepper sprayed Freeman from the porch when Freeman refused to immediately exit his own home. Spoljaric tased Freeman repeatedly for pain compliance while Freeman declared his

police officer. He was subsequently denied his medication in jail and had a seizure as a result. All his money was also stolen. He was also beaten by guards while in a restraint chair and tased in the back while handcuffed. This man also said that his uncle was beaten by guards while in jail. Finally, this man was one of several who reported to me that guards pay inmates to beat up other inmates and the guards disable cell cameras to enable the beatings.

58. I interviewed a citizen who said her father had been arrested for possession of illegal drugs and is being confined in a rehab facility as a condition of bail. I heard from other citizens that Judge Waldo gives a similar post-conviction order.

59. I was told by several citizens that Waldo sends victims to rehab clinics that Judge Andy Ballard benefits from, and that Ballard sends victims to rehab clinics that Waldo benefits from. I was also told that commissioners, judges, and prosecutors benefit from the local rehab clinics.

60. I interviewed Donald Roberts, a relative of IPD officer Joe Akers, who felt above the law due to that association. I witnessed Roberts batter a colleague member of the press who was standing there filming. Roberts also assaulted me, threatening to murder me. I reported the incident to IPD Officer Steve Wilson. Roberts was not cited. This attack was the result of IPD and WOWK-TV's defamatory reporting.

61. There was a small group of Ironton citizens and IPD officers that did a "back the blue" rally in downtown Ironton, targeting me and my presence in town. This rally was additionally the result of IPD and WOWK-TV's defamatory reporting.

62. **March 29, 2022.** I published security camera footage showing Sheriff's Deputy Jonathan Spojaric, who was responding to a 911 call that Kent Freeman had made. Spoljaric pepper sprayed Freeman from the porch when Freeman refused to immediately exit his own home. Spoljaric tased Freeman repeatedly for pain compliance while Freeman declared his

innocence and begged Spoljaric to stop tasing him. Freeman experienced a heart attack during the incident and filed a § 1983 claim in April of 2022 that is still ongoing.

63. **March 29, 2022 Unlawful Arrest of Plaintiff.** At 3:05 P.M., I entered the Ironton City Hall, a traditional public forum at 301 South 3rd Street, Ironton, Ohio 45638, through an unlocked door.

64. Less than a minute later, I inquired about renting the common area of the city hall with an employee behind a service window. The employee stated that the Mayor's office does that. I mentioned that Cramblit had been avoiding me, but was told that Cramblit's secretary handles it, and not Cramblit himself.

65. At 3:07 P.M. I reached Cramblit's office upstairs and was told that he had left for the day already. I inquired about renting the lobby area. I was told that I would be given a piece of paper to fill out. I was then given conflicting information that Cramblit had to approve the request, so that I would be unable to rent the space today. I mentioned that since I'd been in town, I'd been unable to get ahold of Cramblit and demanded that Cramblit be called on the phone for authorization, or he could do a signature remotely. I continued to protest against the violation of my right to use the public space. I offered to pay a fee and filled out the application, checking the "Assemblage" box to rent the lobby starting at 3:15 P.M. on March 29, 2022. I left the ending time blank. I updated my team and my invite for the constitutional rights class that I had planned with the new location, expecting that we would be allowed to use the space without our rights being violated, and that Cramblit would do the right thing and authorize the request.

66. At 3:16 P.M. I saw a sign erected by the City of Ironton in the City Hall that said that "ANDERSON & ANDERSON, LAW FIRM" was a proud supporter of the IPD. Ironton Prosecutor Brigham Anderson ("Anderson") is a member of this law firm, which clearly has

innocence and begged Spoljaric to stop tasing him. Freeman experienced a heart attack during the incident and filed a § 1983 claim in April of 2022 that is still ongoing.

63. **March 29, 2022 Unlawful Arrest of Plaintiff.** At 3:05 P.M., I entered the Ironton City Hall, a traditional public forum at 301 South 3rd Street, Ironton, Ohio 45638, through an unlocked door.

64. Less than a minute later, I inquired about renting the common area of the city hall with an employee behind a service window. The employee stated that the Mayor's office does that. I mentioned that Cramblit had been avoiding me, but was told that Cramblit's secretary handles it, and not Cramblit himself.

65. At 3:07 P.M. I reached Cramblit's office upstairs and was told that he had left for the day already. I inquired about renting the lobby area. I was told that I would be given a piece of paper to fill out. I was then given conflicting information that Cramblit had to approve the request, so that I would be unable to rent the space today. I mentioned that since I'd been in town, I'd been unable to get ahold of Cramblit and demanded that Cramblit be called on the phone for authorization, or he could do a signature remotely. I continued to protest against the violation of my right to use the public space. I offered to pay a fee and filled out the application, checking the "Assemblage" box to rent the lobby starting at 3:15 P.M. on March 29, 2022. I left the ending time blank. I updated my team and my invite for the constitutional rights class that I had planned with the new location, expecting that we would be allowed to use the space without our rights being violated, and that Cramblit would do the right thing and authorize the request.

66. At 3:16 P.M. I saw a sign erected by the City of Ironton in the City Hall that said that "ANDERSON & ANDERSON, LAW FIRM" was a proud supporter of the IPD. Ironton Prosecutor Brigham Anderson ("Anderson") is a member of this law firm, which clearly has

contributed financially to the IPD, creating a conflict of interest.

67. At 3:21 P.M. I exited the City Hall to ask someone to lock up my gun, after witnessing a no weapons sign in the City Hall. I re-entered the building about a minute later, through an unlocked door.

68. While waiting for people to attend the constitutional rights class, I continued to ask for attendees to remain peaceful and non-violent.

69. At 4:20 P.M. an unknown person with unknown status and unknown authority said that "We have a policy here, that if you want to rent the building, it has to be approved [with] 24 hours' notice." I continued to assert my rights to have equal access to the space. I had now heard different fabrications that continued to escalate the denial of my rights. First, that Cramblit's secretary could approve the usage of the space. Then, Cramblit himself had to authorize the space. Then, Cramblit had conveniently left early, unable to authorize the use of the space. After I demanded that they get Cramblit to remotely authorize the space, this unknown person approached me and would have me believe that even after they got ahold of Cramblit for authorization, that Cramblit had suddenly fabricated a new "policy" requiring 24 hours' notice. A citizen, in a position to know, confirmed with me that the lobby was regularly used for weddings and birthday parties.

70. At 4:58 P.M. the lights were turned off in the lobby, to further interfere with my right to use the lobby. The public facing lobby door was still unlocked and the building was still open to the public, with members of the public besides me still in the building lobby.

71. At 4:59 P.M. Pam Wagner entered the back door from the IPD station, followed by five IPD officers. I started filming them.

72. At 4:59 P.M. and 32 seconds, Wagner raised her right hand and said, "Jose M.

contributed financially to the IPD, creating a conflict of interest.

67. At 3:21 P.M. I exited the City Hall to ask someone to lock up my gun, after witnessing a no weapons sign in the City Hall. I re-entered the building about a minute later, through an unlocked door.

68. While waiting for people to attend the constitutional rights class, I continued to ask for attendees to remain peaceful and non-violent.

69. At 4:20 P.M. an unknown person with unknown status and unknown authority said that "We have a policy here, that if you want to rent the building, it has to be approved [with] 24 hours' notice." I continued to assert my rights to have equal access to the space. I had now heard different fabrications that continued to escalate the denial of my rights. First, that Cramblit's secretary could approve the usage of the space. Then, Cramblit himself had to authorize the space. Then, Cramblit had conveniently left early, unable to authorize the use of the space. After I demanded that they get Cramblit to remotely authorize the space, this unknown person approached me and would have me believe that even after they got ahold of Cramblit for authorization, that Cramblit had suddenly fabricated a new "policy" requiring 24 hours' notice. A citizen, in a position to know, confirmed with me that the lobby was regularly used for weddings and birthday parties.

70. At 4:58 P.M. the lights were turned off in the lobby, to further interfere with my right to use the lobby. The public facing lobby door was still unlocked and the building was still open to the public, with members of the public besides me still in the building lobby.

71. At 4:59 P.M. Pam Wagner entered the back door from the IPD station, followed by five IPD officers. I started filming them.

72. At 4:59 P.M. and 32 seconds, Wagner raised her right hand and said, "Jose M.

DeCastro, cease and desist your disorderly conduct, or you will be arrested." I was engaging in no disorderly conduct, but just standing there holding a camera. At the time, the public facing lobby door was still unlocked and the building was still open to the public, with members of the public besides me still in the building lobby.

73. I said, "I'm more than willing…" but Wagner yelled over me. Wagner yelled "Jose M. DeCastro", and she paused. I said "I hear you. I hear you ma'am." Wagner then continued with "Vacate right now or you will be arrested." It was 4:59 P.M. and 44 seconds when she finished saying this. I did not feel free to leave, due to her commands and hand gestures, which were an open hand indicating stop followed then by a raised finger. I was not afforded an opportunity to leave the building or an opportunity to ask if I was being threatened with trespass.

74. I said, "I'm more than willing to go with you." Wagner then started repeating herself, "Jose M. DeC…", before she realized what I said. Wagner then said, "You will?", and then motioned me toward her with her fingers. She said, "Let's go!".

75. I said, "If you're going to arrest me?". They did confirm that they were going to arrest me by not denying it and Wagner then waved me toward the back door to the IPD. Additionally, the other officers kept approaching me. I then said in a calm voice, to indicate my compliance, "If I'm under arrest, I'll go with you." It was 4:49 P.M. and 51 seconds when I finished saying this. Immediately after I said this, McKnight said, "Put your hands behind your back. You're under arrest." It was 4:49 P.M. and 53 seconds when he finished saying that. I started protesting for specific medical needs, that I couldn't be handcuffed behind my back while also continuing to voice my compliance in a calm voice, and the officers all escorted me calmly through the back door of the lobby into the IPD station. Spoljaric offered to handcuff me in the front. At the time, the public facing lobby door was still unlocked and the building was still open to the public, with

DeCastro, cease and desist your disorderly conduct, or you will be arrested." I was engaging in no disorderly conduct, but just standing there holding a camera. At the time, the public facing lobby door was still unlocked and the building was still open to the public, with members of the public besides me still in the building lobby.

73. I said, "I'm more than willing…" but Wagner yelled over me. Wagner yelled "Jose M. DeCastro", and she paused. I said "I hear you. I hear you ma'am." Wagner then continued with "Vacate right now or you will be arrested." It was 4:59 P.M. and 44 seconds when she finished saying this. I did not feel free to leave, due to her commands and hand gestures, which were an open hand indicating stop followed then by a raised finger. I was not afforded an opportunity to leave the building or an opportunity to ask if I was being threatened with trespass.

74. I said, "I'm more than willing to go with you." Wagner then started repeating herself, "Jose M. DeC…", before she realized what I said. Wagner then said, "You will?", and then motioned me toward her with her fingers. She said, "Let's go!".

75. I said, "If you're going to arrest me?". They did confirm that they were going to arrest me by not denying it and Wagner then waved me toward the back door to the IPD. Additionally, the other officers kept approaching me. I then said in a calm voice, to indicate my compliance, "If I'm under arrest, I'll go with you." It was 4:49 P.M. and 51 seconds when I finished saying this. Immediately after I said this, McKnight said, "Put your hands behind your back. You're under arrest." It was 4:49 P.M. and 53 seconds when he finished saying that. I started protesting for specific medical needs, that I couldn't be handcuffed behind my back while also continuing to voice my compliance in a calm voice, and the officers all escorted me calmly through the back door of the lobby into the IPD station. Spoljaric offered to handcuff me in the front. At the time, the public facing lobby door was still unlocked and the building was still open to the public, with

members of the public besides me still in the building lobby. I did not wish to be arrested. The officers did not have and did not present a warrant for my arrest.

76. As soon as I was in the IPD, out of the view of the public, I was immediately, and unnecessarily grabbed, with unnecessary force, by McKnight who tried to handcuff me in the back. Spoljaric advocated for handcuffing me in the front, and once McKnight let go of me after I pleaded multiple times, I was handcuffed in the front. The officers took my cell phone, which was an iPhone 12 Max Pro.

77. There were other members of the public in the building. None of them were arrested, even though Wagner had to step around one of them to confront me. I had no intention of trespassing, disorderly conduct, or resisting arrest. I did not engage in disorderly conduct, I did not resist arrest, and I did not trespass. I did not witness any owner or duly authorized person ask the IPD to trespass me from the building. My invitation to the building was never revoked as a result of the building being closed to the public. I was threatened that I would be arrested if I didn't stop my disorderly conduct, but I was not engaging in disorderly conduct.

78. (My original complaint and first amended complaint used the time on the City Hall's wall clock, seen in my YouTube video of the arrest, to determine the time of events. This complaint uses the more accurate time recorded by YouTube for the arrest video, which was streamed to YouTube in real time as it was recorded. Since 2019, YouTube's meta data servers are hosted on Google's Spanner technology, which has some of the world's most accurate clocks, with an atomic clock assigned to each cluster. The timestamps on YouTube meta data are expected to be accurate to within a few nanoseconds. YouTube's timestamps are more accurate than the wall clock at the City Hall, which apparently was at least a few minutes fast, and which the defendants already knew about, but have failed to provide any exculpatory evidence in the

members of the public besides me still in the building lobby. I did not wish to be arrested. The officers did not have and did not present a warrant for my arrest.

76. As soon as I was in the IPD, out of the view of the public, I was immediately, and unnecessarily grabbed, with unnecessary force, by McKnight who tried to handcuff me in the back. Spoljaric advocated for handcuffing me in the front, and once McKnight let go of me after I pleaded multiple times, I was handcuffed in the front. The officers took my cell phone, which was an iPhone 12 Max Pro.

77. There were other members of the public in the building. None of them were arrested, even though Wagner had to step around one of them to confront me. I had no intention of trespassing, disorderly conduct, or resisting arrest. I did not engage in disorderly conduct, I did not resist arrest, and I did not trespass. I did not witness any owner or duly authorized person ask the IPD to trespass me from the building. My invitation to the building was never revoked as a result of the building being closed to the public. I was threatened that I would be arrested if I didn't stop my disorderly conduct, but I was not engaging in disorderly conduct.

78. (My original complaint and first amended complaint used the time on the City Hall's wall clock, seen in my YouTube video of the arrest, to determine the time of events. This complaint uses the more accurate time recorded by YouTube for the arrest video, which was streamed to YouTube in real time as it was recorded. Since 2019, YouTube's meta data servers are hosted on Google's Spanner technology, which has some of the world's most accurate clocks, with an atomic clock assigned to each cluster. The timestamps on YouTube meta data are expected to be accurate to within a few nanoseconds. YouTube's timestamps are more accurate than the wall clock at the City Hall, which apparently was at least a few minutes fast, and which the defendants already knew about, but have failed to provide any exculpatory evidence in the

criminal case as required.)

79. **March 29, 2022 Abuse of power by Jailer.** At the Lawrence County Jail, they had a man follow me with a camcorder. After exiting the full body scanner, I was asked my name and date of birth, which I provided. I was asked for my social security number. I told the requestor that he didn't need it. I asked one of the officers there that I only know as Steve, "Do you know that that's not right to ask my social security number?" Steve said, "Yes sir". Other officers said that they can ask me anything, and that I cannot answer. Although the Jail sent me some video, the video of John Chapman's abuse of power was suspiciously missing.

80. At one time, while in a room with John Chapman, he asked me to provide my social security number. He said that if I refused that the jail would list me as a "John Doe" and that I would be incarcerated for up to three months until the FBI came back with confirmation of my identity. Besides the threats, Chapman delayed my processing into the jail while I refused to provide my social security number. After two hours, Chapman came back to me and threatened to charge me with felony obstruction if I didn't provide my social security number. Chapman did not indicate a statutory authority for mandatory access to my social security number and he did not say what it would be used for. Chapman had my driver license number which works just as well for verifying someone's identity in government databases. Under continued threats to my civil rights and further denial of my civil rights, I provided my social security number. The guards showed me a computer screen listing over 20 inmates with social security numbers that they had also obtained through the same methods.

81. When released from Jail on bail, my cell phone was not returned to me. I called the IPD later demanding the return of my cell phone. I then had to rent a cell phone. (I later had to purchase a replacement cell phone because it would be a while before the IPD returned my cell

criminal case as required.)

79. **March 29, 2022 Abuse of power by Jailer.** At the Lawrence County Jail, they had a man follow me with a camcorder. After exiting the full body scanner, I was asked my name and date of birth, which I provided. I was asked for my social security number. I told the requestor that he didn't need it. I asked one of the officers there that I only know as Steve, "Do you know that that's not right to ask my social security number?" Steve said, "Yes sir". Other officers said that they can ask me anything, and that I cannot answer. Although the Jail sent me some video, the video of John Chapman's abuse of power was suspiciously missing.

80. At one time, while in a room with John Chapman, he asked me to provide my social security number. He said that if I refused that the jail would list me as a "John Doe" and that I would be incarcerated for up to three months until the FBI came back with confirmation of my identity. Besides the threats, Chapman delayed my processing into the jail while I refused to provide my social security number. After two hours, Chapman came back to me and threatened to charge me with felony obstruction if I didn't provide my social security number. Chapman did not indicate a statutory authority for mandatory access to my social security number and he did not say what it would be used for. Chapman had my driver license number which works just as well for verifying someone's identity in government databases. Under continued threats to my civil rights and further denial of my civil rights, I provided my social security number. The guards showed me a computer screen listing over 20 inmates with social security numbers that they had also obtained through the same methods.

81. When released from Jail on bail, my cell phone was not returned to me. I called the IPD later demanding the return of my cell phone. I then had to rent a cell phone. (I later had to purchase a replacement cell phone because it would be a while before the IPD returned my cell

phone and because they returned it in an unusable state).

82. **March 30, 2022.** The IPD released false police reports to the press and to prosecutors accusing me of a crime when none was committed. This defamation and abuse of process harmed my reputation when the press reported on the false information and I had to initiate a costly criminal defense against false charges of Resisting Arrest (O.R.C. 2921.33), Criminal Trespass (O.R.C. 2911.21), and Disorderly Conduct (2917.11), brought against me by Anderson.

83. I called the IPD demanding the return of my cell phone.

84. **March 31, 2022**. I called the IPD demanding the return of my cell phone.

85. **April 1, 2022.** IPD's search warrant application for my cell phone was denied by Ironton Municipal Court. In the same denial, Waldo ordered the IPD to return my cell phone to me "forthwith". They did not do that.

86. **April 4, 2022.** I filed a complaint for replevin with the Ironton Municipal Court for the return of my cell phone.

87. **April 5, 2022.** I published an interview with a woman who was groomed as a middle schooler by Jonathan Spoljaric and had a sexual relationship with him, while he was married and while she was a minor. Spoljaric was also having a sexual relationship with another high schooler at the same time. IPD Officer Adam Koch was also having a sexual relationship with a high schooler. Koch had already resigned prior to my interview. I reported this to the FBI.

88, I delivered a demand letter for the return of my cell phone to the IPD.

89. **April 10, 2022.** Samantha, who identified herself as "Samantha at the Clerk of Courts" allegedly returned a call to a number from where a caller had allegedly said something obscene. Samantha's phone call was to Darin Haberkorn. Haberkorn returned Samantha's call at which time Samantha told Haberkorn that Plaintiff had spoofed Haberkorn's phone number and had

phone and because they returned it in an unusable state).

82. **March 30, 2022.** The IPD released false police reports to the press and to prosecutors accusing me of a crime when none was committed. This defamation and abuse of process harmed my reputation when the press reported on the false information and I had to initiate a costly criminal defense against false charges of Resisting Arrest (O.R.C. 2921.33), Criminal Trespass (O.R.C. 2911.21), and Disorderly Conduct (2917.11), brought against me by Anderson.

83. I called the IPD demanding the return of my cell phone.

84. **March 31, 2022**. I called the IPD demanding the return of my cell phone.

85. **April 1, 2022.** IPD's search warrant application for my cell phone was denied by Ironton Municipal Court. In the same denial, Waldo ordered the IPD to return my cell phone to me "forthwith". They did not do that.

86. **April 4, 2022.** I filed a complaint for replevin with the Ironton Municipal Court for the return of my cell phone.

87. **April 5, 2022.** I published an interview with a woman who was groomed as a middle schooler by Jonathan Spoljaric and had a sexual relationship with him, while he was married and while she was a minor. Spoljaric was also having a sexual relationship with another high schooler at the same time. IPD Officer Adam Koch was also having a sexual relationship with a high schooler. Koch had already resigned prior to my interview. I reported this to the FBI.

88, I delivered a demand letter for the return of my cell phone to the IPD.

89. **April 10, 2022.** Samantha, who identified herself as "Samantha at the Clerk of Courts" allegedly returned a call to a number from where a caller had allegedly said something obscene. Samantha's phone call was to Darin Haberkorn. Haberkorn returned Samantha's call at which time Samantha told Haberkorn that Plaintiff had spoofed Haberkorn's phone number and had

used it to make obscene calls to the "local court offices", and that Plaintiff had also spoofed other numbers to do the same thing in order to make "really vulgar remarks". My reputation was harmed by this untrue defamatory claim of multiple criminal acts committed by me. Samantha should have known by the alleged obscene call, that it wasn't my voice, if any obscene call had even actually been made. Samantha was responsible for the untrue statements of fact that she deliberately and maliciously made against my character when she used my name and asserted as fact to a third party that I had committed several crimes.

90. **April 13, 2022.** I filed the instant case.

91. **April 28, 2022.** The prosecuting attorney for my trespass case asked the court that I not be allowed to come within 100 feet of or in any way confront Pam Wagner, Robert Fouch, Brad Spoljaric, Matt McGraw, Shannon Litton, Samuel Cramblit, Lisa Adkins, Terry Smith, Chance Blankenship, Brandon Blankenship, Attorney Warren Morford, and Evan McKnight. Judge Waldo granted the request, chilling my civil rights.

92. Terry Smith is the assistant of Cramblit, whose offices I visited regularly to try to get an interview with him. I had only ever been polite when dealing with Smith. As the mayor is the executive of the City of Ironton, Ohio, this restraining order deliberately and maliciously chilled many of my rights to address the government regarding violations of civil rights committed by the IPD.

93. Wagner of the IPD returned parts of my cell phone to me after a replevin hearing and after the replevin action was dismissed. The phone showed signs of being searched and or cloned in that it was missing the following items: 1) sim card, 2) sim card tray. Additionally, the hole where the sim card tray goes into the phone was damaged. I asked about the damage and missing parts, but Wagner simply said that she did not know what had happened to it. I was not afforded

used it to make obscene calls to the "local court offices", and that Plaintiff had also spoofed other numbers to do the same thing in order to make "really vulgar remarks". My reputation was harmed by this untrue defamatory claim of multiple criminal acts committed by me. Samantha should have known by the alleged obscene call, that it wasn't my voice, if any obscene call had even actually been made. Samantha was responsible for the untrue statements of fact that she deliberately and maliciously made against my character when she used my name and asserted as fact to a third party that I had committed several crimes.

90. **April 13, 2022.** I filed the instant case.

91. **April 28, 2022.** The prosecuting attorney for my trespass case asked the court that I not be allowed to come within 100 feet of or in any way confront Pam Wagner, Robert Fouch, Brad Spoljaric, Matt McGraw, Shannon Litton, Samuel Cramblit, Lisa Adkins, Terry Smith, Chance Blankenship, Brandon Blankenship, Attorney Warren Morford, and Evan McKnight. Judge Waldo granted the request, chilling my civil rights.

92. Terry Smith is the assistant of Cramblit, whose offices I visited regularly to try to get an interview with him. I had only ever been polite when dealing with Smith. As the mayor is the executive of the City of Ironton, Ohio, this restraining order deliberately and maliciously chilled many of my rights to address the government regarding violations of civil rights committed by the IPD.

93. Wagner of the IPD returned parts of my cell phone to me after a replevin hearing and after the replevin action was dismissed. The phone showed signs of being searched and or cloned in that it was missing the following items: 1) sim card, 2) sim card tray. Additionally, the hole where the sim card tray goes into the phone was damaged. I asked about the damage and missing parts, but Wagner simply said that she did not know what had happened to it. I was not afforded

an opportunity before the replevin action was dismissed to address the damage or have it corrected. Wagner simply verbally dismissed my damage complaint.

94. **April 30, 2022.** I publicly announced that I was headed to the sheriff's auto auction. As a result, four IPD officers were dispatched by Wagner to the auction and arrived ahead of me. While at the auction, I heard from two other citizens who complained about their vehicles being seized. One person was required to pay an impound fee to recover their own stolen car. I also heard from two other people who had their cash illegally stolen when arrested. One of them had been arrested for not wearing a seatbelt. A man I interviewed said that Gue unnecessarily closed the patrol car door on his legs after Gue unnecessarily tackled him to the ground for an obstruction arrest.

95. I would later found out that IPD officers tried calling the parole officer to get my bail revoked while they were at the auction.

96. **May 11, 2022.** Ironton Prosecutor Anderson tried to revoke my bond for violating the conditions of my bond for "coming into contact with witnesses" at a city council meeting on April 28, 2022. This was the same day that the restriction was put in place, and before I was aware of it. Additionally, Wagner called that witness to the city council meeting that I was attending, and that witness arrived after me. Additionally, the prosecutor cited the above mentioned April 30, 2022 event, where the police were dispatched ahead of me to the auction, which they had never attended before.

97. Anderson is a known financial support of the IPD, creating a conflict of interest. As a result of the close relationship with the IPD, Anderson is hesitant to challenge or investigate potential misconduct by the IPD. Anderson is also exposed to undue pressure or influence to pursue certain cases or charges submitted by the IPD. This causes a conflict of interest when

an opportunity before the replevin action was dismissed to address the damage or have it corrected. Wagner simply verbally dismissed my damage complaint.

94. **April 30, 2022.** I publicly announced that I was headed to the sheriff's auto auction. As a result, four IPD officers were dispatched by Wagner to the auction and arrived ahead of me. While at the auction, I heard from two other citizens who complained about their vehicles being seized. One person was required to pay an impound fee to recover their own stolen car. I also heard from two other people who had their cash illegally stolen when arrested. One of them had been arrested for not wearing a seatbelt. A man I interviewed said that Gue unnecessarily closed the patrol car door on his legs after Gue unnecessarily tackled him to the ground for an obstruction arrest.

95. I would later found out that IPD officers tried calling the parole officer to get my bail revoked while they were at the auction.

96. **May 11, 2022.** Ironton Prosecutor Anderson tried to revoke my bond for violating the conditions of my bond for "coming into contact with witnesses" at a city council meeting on April 28, 2022. This was the same day that the restriction was put in place, and before I was aware of it. Additionally, Wagner called that witness to the city council meeting that I was attending, and that witness arrived after me. Additionally, the prosecutor cited the above mentioned April 30, 2022 event, where the police were dispatched ahead of me to the auction, which they had never attended before.

97. Anderson is a known financial support of the IPD, creating a conflict of interest. As a result of the close relationship with the IPD, Anderson is hesitant to challenge or investigate potential misconduct by the IPD. Anderson is also exposed to undue pressure or influence to pursue certain cases or charges submitted by the IPD. This causes a conflict of interest when

holding police officers accountable for misconduct. At a minimum, this at least provides the perception of a conflict of interest.

98. **June 4, 2022.** Sheriff's Deputy Jonathan Spoljaric resigns after an Ironton Tribune article about him being sued by Kent Freeman for the abuse captured in the video that I published on March 29, 2022.

99. **July 27, 2022.** IPD Officer Brad Spoljaric was arrested for domestic violence, drug trafficking, and tampering with evidence. Spoljaric was residing with McKnight when Spoljaric was arrested. The drugs were found in McKnight's home. Twenty grams of meth, and eight grams of fentanyl. Waldo asked Spoljaric if he would like to be found indigent to qualify for a free public defender, instead of having him apply and qualify under actual financial grounds. (Spoljaric would later plead guilty.)

100. **August 14, 2022.** Beth Rist, the first female police officer in Ironton, released a YouTube video about 17 women who were coerced to have sex with IPD officers to get out of traffic tickets. Since then, she has published a book on the corruption in Ironton. "Rist vs Ironton... The Real Story". Rist sued the department for sexual harassment in 2001 and won in arbitration but was fired in retaliation. Although she'd won the binding arbitration with the union, the city had a judge overrule it. After she filed the suit, a cat, that had been cut open, was thrown into her backyard. When she went to work after that, William Garland, who was now the captain told Rist. "I smell dead pussy." After she left the department, Rist would be working at her new job, and police officers would drive by, honk their horns, and laugh at her. Although she was hated in the police department, Rist ran for city council and won.

101. **August 22, 2022.** Ironton Mayor Sam Cramblit was charged with operating a vehicle while impaired by the Ohio State Highway Patrol. At the traffic stop, Cramblit said, "This is off

holding police officers accountable for misconduct. At a minimum, this at least provides the perception of a conflict of interest.

98. **June 4, 2022.** Sheriff's Deputy Jonathan Spoljaric resigns after an Ironton Tribune article about him being sued by Kent Freeman for the abuse captured in the video that I published on March 29, 2022.

99. **July 27, 2022.** IPD Officer Brad Spoljaric was arrested for domestic violence, drug trafficking, and tampering with evidence. Spoljaric was residing with McKnight when Spoljaric was arrested. The drugs were found in McKnight's home. Twenty grams of meth, and eight grams of fentanyl. Waldo asked Spoljaric if he would like to be found indigent to qualify for a free public defender, instead of having him apply and qualify under actual financial grounds. (Spoljaric would later plead guilty.)

100. **August 14, 2022.** Beth Rist, the first female police officer in Ironton, released a YouTube video about 17 women who were coerced to have sex with IPD officers to get out of traffic tickets. Since then, she has published a book on the corruption in Ironton. "Rist vs Ironton... The Real Story". Rist sued the department for sexual harassment in 2001 and won in arbitration but was fired in retaliation. Although she'd won the binding arbitration with the union, the city had a judge overrule it. After she filed the suit, a cat, that had been cut open, was thrown into her backyard. When she went to work after that, William Garland, who was now the captain told Rist. "I smell dead pussy." After she left the department, Rist would be working at her new job, and police officers would drive by, honk their horns, and laugh at her. Although she was hated in the police department, Rist ran for city council and won.

101. **August 22, 2022.** Ironton Mayor Sam Cramblit was charged with operating a vehicle while impaired by the Ohio State Highway Patrol. At the traffic stop, Cramblit said, "This is off

the record. I'm the mayor here in Ironton, I'm just wondering what you guys are doing in town." He wasn't used to having anyone but his local corrupt police force in his town, but he still wasn't taken to jail, but released at the scene to a sober driver. Cramblit's attorney said that he was disappointed that anyone was pursuing the charges. (The previous Mayor, Rich Blankenship pleaded guilty to a DUI in 2012.)

102. **November 13, 2022.** IPD Officer Matthew McGraw died suspiciously at his own home.

103. **January 31, 2023.** Pam Wagner retires from the IPD, to "Play with my grand babies!".

104. **November 22, 2023.** I was pulled over for a traffic infraction in Las Vegas, Nevada by the Nevada Highway Patrol. The officers read in their database a warrant for contempt of court out of Ohio "with a flag for violent tendencies", placed there by the IPD, the City of Ironton, and individual IPD officer defendants in this action. As a direct result of the "violent tendencies" defamatory comment in the database placed there by the above defendants, the Nevada Highway Patrol said that I must be handcuffed while detained. I was aggressively detained, battered, and painfully handcuffed.

**COUNT 1**

105. Plaintiff refers to paragraphs 1-104 of this Complaint and incorporates by reference the allegations of said paragraphs as though expressly set forth at length at this point.

106. Arrest without probable cause or a warrant under the Ohio Constitution and Bill of Rights, the Nevada Constitution and Bill of Rights, U.S. Constitution, federal statute, state statute, and common law, against Pam Wagner, Brad Spoljaric, Chance Blankenship, Evan McKnight, Robert Fouch, and Does 1 to 7.

the record. I'm the mayor here in Ironton, I'm just wondering what you guys are doing in town." He wasn't used to having anyone but his local corrupt police force in his town, but he still wasn't taken to jail, but released at the scene to a sober driver. Cramblit's attorney said that he was disappointed that anyone was pursuing the charges. (The previous Mayor, Rich Blankenship pleaded guilty to a DUI in 2012.)

102. **November 13, 2022.** IPD Officer Matthew McGraw died suspiciously at his own home.

103. **January 31, 2023.** Pam Wagner retires from the IPD, to "Play with my grand babies!".

104. **November 22, 2023.** I was pulled over for a traffic infraction in Las Vegas, Nevada by the Nevada Highway Patrol. The officers read in their database a warrant for contempt of court out of Ohio "with a flag for violent tendencies", placed there by the IPD, the City of Ironton, and individual IPD officer defendants in this action. As a direct result of the "violent tendencies" defamatory comment in the database placed there by the above defendants, the Nevada Highway Patrol said that I must be handcuffed while detained. I was aggressively detained, battered, and painfully handcuffed.

**COUNT 1**

105. Plaintiff refers to paragraphs 1-104 of this Complaint and incorporates by reference the allegations of said paragraphs as though expressly set forth at length at this point.

106. Arrest without probable cause or a warrant under the Ohio Constitution and Bill of Rights, the Nevada Constitution and Bill of Rights, U.S. Constitution, federal statute, state statute, and common law, against Pam Wagner, Brad Spoljaric, Chance Blankenship, Evan McKnight, Robert Fouch, and Does 1 to 7.

107. The factual allegations show that I was intentionally deprived of my liberty, that I was aware of my confinement, I did not consent to the confinement, and the officers lacked privilege or a warrant to confine me. I was not trespassing as the building was still open to the public. I was not engaging in disorderly conduct in that I was simply standing there exercising my First Amendment rights by filming the police in a traditional public forum. I was speaking in a calm voice and encouraged my constitutional class members to be peaceful and non-violent. Finally, I did nothing to resist arrest, and in fact continued to voice my compliance. Defendants only needed to give me clear verbal commands and did not need to touch me for my compliance. Further, even if I'm found guilty of trespass, it's only as a direct and proximate result of being denied equal access to the City Hall, and due to trespass statutes being enforced or codified contrary to the civil rights guaranteed by the United States Constitution.

108. I was harmed as a direct and proximate result by being deprived of my liberty for a period of time, being unable to do what I wanted or go where I wanted.

109. Defendants' malicious, oppressive, and despicable conduct, carried out in a full and conscious disregard for my rights and safety entitles Plaintiff to punitive damages and penalties allowable under 42 U.S.C. § 1983 and Ohio and Nevada law in an amount sufficient to punish and deter such conduct.

**COUNT 2**

110. Plaintiff refers to paragraphs 1-104 of this Complaint and incorporates by reference the allegations of said paragraphs as though expressly set forth at length at this point.

111. Unreasonable search under the Ohio Constitution and Bill of Rights, the Nevada Constitution and Bill of Rights, U.S. Constitution, federal statute, state statute, and common law, against Pam Wagner, Brad Spoljaric, Chance Blankenship, Evan McKnight, Robert Fouch, and

107. The factual allegations show that I was intentionally deprived of my liberty, that I was aware of my confinement, I did not consent to the confinement, and the officers lacked privilege or a warrant to confine me. I was not trespassing as the building was still open to the public. I was not engaging in disorderly conduct in that I was simply standing there exercising my First Amendment rights by filming the police in a traditional public forum. I was speaking in a calm voice and encouraged my constitutional class members to be peaceful and non-violent. Finally, I did nothing to resist arrest, and in fact continued to voice my compliance. Defendants only needed to give me clear verbal commands and did not need to touch me for my compliance. Further, even if I'm found guilty of trespass, it's only as a direct and proximate result of being denied equal access to the City Hall, and due to trespass statutes being enforced or codified contrary to the civil rights guaranteed by the United States Constitution.

108. I was harmed as a direct and proximate result by being deprived of my liberty for a period of time, being unable to do what I wanted or go where I wanted.

109. Defendants' malicious, oppressive, and despicable conduct, carried out in a full and conscious disregard for my rights and safety entitles Plaintiff to punitive damages and penalties allowable under 42 U.S.C. § 1983 and Ohio and Nevada law in an amount sufficient to punish and deter such conduct.

**COUNT 2**

110. Plaintiff refers to paragraphs 1-104 of this Complaint and incorporates by reference the allegations of said paragraphs as though expressly set forth at length at this point.

111. Unreasonable search under the Ohio Constitution and Bill of Rights, the Nevada Constitution and Bill of Rights, U.S. Constitution, federal statute, state statute, and common law, against Pam Wagner, Brad Spoljaric, Chance Blankenship, Evan McKnight, Robert Fouch, and

Does 1 to 7.

112. The factual allegations show that I was arrested without probable cause and without a warrant, and so the subsequent search of my person, including pockets, wallet, and cell phone was a violation. The totality of the circumstances further show that my cell phone was searched illegally without a warrant, including the fact that the sim card tray had been removed, the sim card had been taken out to be cloned, the sim card slot was damaged as if a cloning cable had been forced into the hole, the fact that a search warrant was applied for, and the fact that my phone was not returned to me until two weeks after the judge ordered it, and when it was returned it was still missing critical parts that would further show that it had been searched and or cloned.

113. I was harmed as a direct and proximate result by the violation of my privacy of the contents of my person, by the negative psychological and emotional impact on my rights being violated and the chilling effect that this had on the future exercise of my rights for fear of further abuse.

114. Defendants' malicious, oppressive, and despicable conduct, carried out in a full and conscious disregard for my rights and safety entitles Plaintiff to punitive damages and penalties allowable under 42 U.S.C. § 1983 and Ohio and Nevada law in an amount sufficient to punish and deter such conduct.

**COUNT 3**

115. Plaintiff refers to paragraphs 1-104 of this Complaint and incorporates by reference the allegations of said paragraphs as though expressly set forth at length at this point.

116. Excessive force in the course of an arrest under the Ohio Constitution and Bill of Rights, the Nevada Constitution and Bill of Rights, U.S. Constitution, federal statute, state

Does 1 to 7.

112. The factual allegations show that I was arrested without probable cause and without a warrant, and so the subsequent search of my person, including pockets, wallet, and cell phone was a violation. The totality of the circumstances further show that my cell phone was searched illegally without a warrant, including the fact that the sim card tray had been removed, the sim card had been taken out to be cloned, the sim card slot was damaged as if a cloning cable had been forced into the hole, the fact that a search warrant was applied for, and the fact that my phone was not returned to me until two weeks after the judge ordered it, and when it was returned it was still missing critical parts that would further show that it had been searched and or cloned.

113. I was harmed as a direct and proximate result by the violation of my privacy of the contents of my person, by the negative psychological and emotional impact on my rights being violated and the chilling effect that this had on the future exercise of my rights for fear of further abuse.

114. Defendants' malicious, oppressive, and despicable conduct, carried out in a full and conscious disregard for my rights and safety entitles Plaintiff to punitive damages and penalties allowable under 42 U.S.C. § 1983 and Ohio and Nevada law in an amount sufficient to punish and deter such conduct.

**COUNT 3**

115. Plaintiff refers to paragraphs 1-104 of this Complaint and incorporates by reference the allegations of said paragraphs as though expressly set forth at length at this point.

116. Excessive force in the course of an arrest under the Ohio Constitution and Bill of Rights, the Nevada Constitution and Bill of Rights, U.S. Constitution, federal statute, state

statute, and common law, against Evan McKnight.

117. The factual allegations show that defendant Evan McKnight unnecessarily used force against me while I was being arrested.

118. I was harmed as a direct and proximate result by feeling physical pain and discomfort, negative psychological and emotional impact of being battered and the chilling effect that this had on the future exercise of my rights for fear of further abuse.

119. Defendants' malicious, oppressive, and despicable conduct, carried out in a full and conscious disregard for my rights and safety entitles Plaintiff to punitive damages and penalties allowable under 42 U.S.C. § 1983 and Ohio and Nevada law in an amount sufficient to punish and deter such conduct.

**COUNT 4**

120. Plaintiff refers to paragraphs 1-104 of this Complaint and incorporates by reference the allegations of said paragraphs as though expressly set forth at length at this point.

121. Defamation under the Ohio Constitution and Bill of Rights, the Nevada Constitution and Bill of Rights, U.S. Constitution, federal statute, state statute, and common law, against Pam Wagner, Brad Spoljaric, Chance Blankenship, Evan McKnight, Robert Fouch, and Does 1 to 7.

122. The factual allegations show that Pam Wagner, Brad Spoljaric, Chance Blankenship, Evan McKnight, Robert Fouch, and Does 1 to 7 did share false police reports with third parties, including a note in national databases saying that I had "violent tendencies" and did make false reports to third party media relating to the negative effect of the safety of children when I'm present and about restaurants closing for safety reasons caused by me. The totality of the facts further indicate that the defamation was done deliberately and maliciously and that the defendants knew that the defamatory statements were about me and were asserted as the truth

statute, and common law, against Evan McKnight.

117. The factual allegations show that defendant Evan McKnight unnecessarily used force against me while I was being arrested.

118. I was harmed as a direct and proximate result by feeling physical pain and discomfort, negative psychological and emotional impact of being battered and the chilling effect that this had on the future exercise of my rights for fear of further abuse.

119. Defendants' malicious, oppressive, and despicable conduct, carried out in a full and conscious disregard for my rights and safety entitles Plaintiff to punitive damages and penalties allowable under 42 U.S.C. § 1983 and Ohio and Nevada law in an amount sufficient to punish and deter such conduct.

**COUNT 4**

120. Plaintiff refers to paragraphs 1-104 of this Complaint and incorporates by reference the allegations of said paragraphs as though expressly set forth at length at this point.

121. Defamation under the Ohio Constitution and Bill of Rights, the Nevada Constitution and Bill of Rights, U.S. Constitution, federal statute, state statute, and common law, against Pam Wagner, Brad Spoljaric, Chance Blankenship, Evan McKnight, Robert Fouch, and Does 1 to 7.

122. The factual allegations show that Pam Wagner, Brad Spoljaric, Chance Blankenship, Evan McKnight, Robert Fouch, and Does 1 to 7 did share false police reports with third parties, including a note in national databases saying that I had "violent tendencies" and did make false reports to third party media relating to the negative effect of the safety of children when I'm present and about restaurants closing for safety reasons caused by me. The totality of the facts further indicate that the defamation was done deliberately and maliciously and that the defendants knew that the defamatory statements were about me and were asserted as the truth

even though they were false.

123. I was harmed as a direct and proximate result by this damaging of my reputation, which directly resulted in 1) my being harassed by parents in Ironton; and 2) public rallies protesting against my presence in Ironton; 3) being forcefully detained at a traffic stop. The defamation also had a direct and proximate negative psychological and emotional impact on me.

124. Defendants' malicious, oppressive, and despicable conduct, carried out in a full and conscious disregard for my rights and safety entitles Plaintiff to punitive damages and penalties allowable under 42 U.S.C. § 1983 and Ohio and Nevada law in an amount sufficient to punish and deter such conduct.

**COUNT 5**

125. Plaintiff refers to paragraphs 1-104 of this Complaint and incorporates by reference the allegations of said paragraphs as though expressly set forth at length at this point.

126. Chilling of First Amendment under the Ohio Constitution and Bill of Rights, the Nevada Constitution and Bill of Rights, U.S. Constitution, federal statute, state statute, and common law, against all defendants.

127. The totality of the circumstances in the factual allegations shows that corruption was afoot in Ironton and that my investigative journalism was bringing the corruption to light. As a result, the perpetrators and their supporters conspired and did take actions that were intended to and did chill my First Amendment rights. Specifically, but not limited to, following me, tracking my movements, defaming me, attempting to find pretextual reasons for my arrest, arresting me, and trying to revoke my bail. This resulted in intimidation and direct restriction of my movement and freedoms to petition the government, perform functions of the press, and to speech.

128. I was harmed as a direct and proximate result by having to refrain from exercising my

even though they were false.

123. I was harmed as a direct and proximate result by this damaging of my reputation, which directly resulted in 1) my being harassed by parents in Ironton; and 2) public rallies protesting against my presence in Ironton; 3) being forcefully detained at a traffic stop. The defamation also had a direct and proximate negative psychological and emotional impact on me.

124. Defendants' malicious, oppressive, and despicable conduct, carried out in a full and conscious disregard for my rights and safety entitles Plaintiff to punitive damages and penalties allowable under 42 U.S.C. § 1983 and Ohio and Nevada law in an amount sufficient to punish and deter such conduct.

**COUNT 5**

125. Plaintiff refers to paragraphs 1-104 of this Complaint and incorporates by reference the allegations of said paragraphs as though expressly set forth at length at this point.

126. Chilling of First Amendment under the Ohio Constitution and Bill of Rights, the Nevada Constitution and Bill of Rights, U.S. Constitution, federal statute, state statute, and common law, against all defendants.

127. The totality of the circumstances in the factual allegations shows that corruption was afoot in Ironton and that my investigative journalism was bringing the corruption to light. As a result, the perpetrators and their supporters conspired and did take actions that were intended to and did chill my First Amendment rights. Specifically, but not limited to, following me, tracking my movements, defaming me, attempting to find pretextual reasons for my arrest, arresting me, and trying to revoke my bail. This resulted in intimidation and direct restriction of my movement and freedoms to petition the government, perform functions of the press, and to speech.

128. I was harmed as a direct and proximate result by having to refrain from exercising my

rights, the government suppressing dissent, and loss of public participation. I also experienced, as a direct and proximate result, the negative psychological and emotional impact of the abuse and the chilling effect that this had on the future exercise of my rights for fear of further abuse.

129. Defendants' malicious, oppressive, and despicable conduct, carried out in a full and conscious disregard for my rights and safety entitles Plaintiff to punitive damages and penalties allowable under 42 U.S.C. § 1983 and Ohio and Nevada law in an amount sufficient to punish and deter such conduct.

**COUNT 6**

130. Plaintiff refers to paragraphs 1-104 of this Complaint and incorporates by reference the allegations of said paragraphs as though expressly set forth at length at this point.

131. First Amendment retaliation under the Ohio Constitution and Bill of Rights, the Nevada Constitution and Bill of Rights, U.S. Constitution, federal statute, state statute, and common law, against all defendants.

132. The facts show that while exercising my first amendment rights recording police under freedom of speech and freedom of press and protesting against police misconduct, I did not do or say anything that would have provided reasonable suspicion or probable cause for the arrest, excessive use of force, and subsequent searches. The totality of the circumstances show that the defendants were in fact motivated by one or more of the three factors enumerated above. There were similarly situated individuals in the lobby that had not made their views known and that were not filming the police, who were not arrested. The arrest did stop me from further exercising my rights.

133. I was harmed as a direct and proximate result by having to refrain from exercising my rights, the government suppressing dissent, and loss of public participation. I also experienced,

rights, the government suppressing dissent, and loss of public participation. I also experienced, as a direct and proximate result, the negative psychological and emotional impact of the abuse and the chilling effect that this had on the future exercise of my rights for fear of further abuse.

129. Defendants' malicious, oppressive, and despicable conduct, carried out in a full and conscious disregard for my rights and safety entitles Plaintiff to punitive damages and penalties allowable under 42 U.S.C. § 1983 and Ohio and Nevada law in an amount sufficient to punish and deter such conduct.

## COUNT 6

130. Plaintiff refers to paragraphs 1-104 of this Complaint and incorporates by reference the allegations of said paragraphs as though expressly set forth at length at this point.

131. First Amendment retaliation under the Ohio Constitution and Bill of Rights, the Nevada Constitution and Bill of Rights, U.S. Constitution, federal statute, state statute, and common law, against all defendants.

132. The facts show that while exercising my first amendment rights recording police under freedom of speech and freedom of press and protesting against police misconduct, I did not do or say anything that would have provided reasonable suspicion or probable cause for the arrest, excessive use of force, and subsequent searches. The totality of the circumstances show that the defendants were in fact motivated by one or more of the three factors enumerated above. There were similarly situated individuals in the lobby that had not made their views known and that were not filming the police, who were not arrested. The arrest did stop me from further exercising my rights.

133. I was harmed as a direct and proximate result by having to refrain from exercising my rights, the government suppressing dissent, and loss of public participation. I also experienced,

as a direct and proximate result, the negative psychological and emotional impact of being battered and the chilling effect that this had on the future exercise of my rights for fear of further abuse. I was harmed as a direct and proximate result by being deprived of my liberty for a period of time, being unable to do what I wanted or go where I wanted.

134. Defendants' malicious, oppressive, and despicable conduct, carried out in a full and conscious disregard for my rights and safety entitles Plaintiff to punitive damages and penalties allowable under 42 U.S.C. § 1983 and Ohio and Nevada law in an amount sufficient to punish and deter such conduct.

**COUNT 7**

135. Plaintiff refers to paragraphs 1-104 of this Complaint and incorporates by reference the allegations of said paragraphs as though expressly set forth at length at this point.

136. Monell Policy and Supervisor Liability claim under the Ohio Constitution and Bill of Rights, the Nevada Constitution and Bill of Rights, U.S. Constitution, federal statute, state statute, and common law, against Pam Wagner, and Ironton.

137. The unconstitutional actions and/or omissions of Pam Wagner, Brad Spoljaric, Chance Blankenship, Evan McKnight, Robert Fouch, and Does 1 to 7 were pursuant to the following customs, policies, practices, and/or procedures of defendants Ironton and Wagner, and which were directed, encouraged, allowed and/or ratified by policymaking officials with Wagner and Ironton:

a. To carry out or tolerate unlawful arrests without probable cause;

b. To carry out or tolerate detentions and arrests based on citizens' exercise of their First Amendment right to criticize and verbally protest officers' actions;

c. To use or tolerate excessive force;

as a direct and proximate result, the negative psychological and emotional impact of being battered and the chilling effect that this had on the future exercise of my rights for fear of further abuse. I was harmed as a direct and proximate result by being deprived of my liberty for a period of time, being unable to do what I wanted or go where I wanted.

134. Defendants' malicious, oppressive, and despicable conduct, carried out in a full and conscious disregard for my rights and safety entitles Plaintiff to punitive damages and penalties allowable under 42 U.S.C. § 1983 and Ohio and Nevada law in an amount sufficient to punish and deter such conduct.

**COUNT 7**

135. Plaintiff refers to paragraphs 1-104 of this Complaint and incorporates by reference the allegations of said paragraphs as though expressly set forth at length at this point.

136. Monell Policy and Supervisor Liability claim under the Ohio Constitution and Bill of Rights, the Nevada Constitution and Bill of Rights, U.S. Constitution, federal statute, state statute, and common law, against Pam Wagner, and Ironton.

137. The unconstitutional actions and/or omissions of Pam Wagner, Brad Spoljaric, Chance Blankenship, Evan McKnight, Robert Fouch, and Does 1 to 7 were pursuant to the following customs, policies, practices, and/or procedures of defendants Ironton and Wagner, and which were directed, encouraged, allowed and/or ratified by policymaking officials with Wagner and Ironton:

a. To carry out or tolerate unlawful arrests without probable cause;

b. To carry out or tolerate detentions and arrests based on citizens' exercise of their First Amendment right to criticize and verbally protest officers' actions;

c. To use or tolerate excessive force;

d. To carry out or tolerate unlawful searches of persons and properties;

e. To carry out or tolerate discriminatory and biased policing and/or racial profiling;

f. To carry out or tolerate unlawful seizures of property;

g. To allow officers to file false police reports.

138. The totality of the circumstances of IPD's consistent abuse of citizens including myself are indicative of the existence of a written or unwritten municipal policy and minimally a longstanding practice. Additionally, Wagner has admitted to dispatching the IPD to intercept me at the auction and at a city council meeting in order to chill my rights. Finally, the factual allegations show that Wagner was present multiple times and witnessed in the behaviors by her subordinates. Discovery will show further proof.

139. I was harmed as a direct and proximate result by violations a – g and those harms are enumerated in the separate claims for each primary claim.

140. Defendants' malicious, oppressive, and despicable conduct, carried out in a full and conscious disregard for my rights and safety entitles Plaintiff to punitive damages and penalties allowable under 42 U.S.C. § 1983 and Ohio and Nevada law in an amount sufficient to punish and deter such conduct.

**COUNT 8**

141. Plaintiff refers to paragraphs 1-104 of this Complaint and incorporates by reference the allegations of said paragraphs as though expressly set forth at length at this point.

142. Monell Policy and Supervisor Liability claim under the Ohio Constitution and Bill of Rights, the Nevada Constitution and Bill of Rights, U.S. Constitution, federal statute, state statute, and common law, against Lawrence County and Does 9 to 10.

d. To carry out or tolerate unlawful searches of persons and properties;

e. To carry out or tolerate discriminatory and biased policing and/or racial profiling;

f. To carry out or tolerate unlawful seizures of property;

g. To allow officers to file false police reports.

138. The totality of the circumstances of IPD's consistent abuse of citizens including myself are indicative of the existence of a written or unwritten municipal policy and minimally a longstanding practice. Additionally, Wagner has admitted to dispatching the IPD to intercept me at the auction and at a city council meeting in order to chill my rights. Finally, the factual allegations show that Wagner was present multiple times and witnessed in the behaviors by her subordinates. Discovery will show further proof.

139. I was harmed as a direct and proximate result by violations a – g and those harms are enumerated in the separate claims for each primary claim.

140. Defendants' malicious, oppressive, and despicable conduct, carried out in a full and conscious disregard for my rights and safety entitles Plaintiff to punitive damages and penalties allowable under 42 U.S.C. § 1983 and Ohio and Nevada law in an amount sufficient to punish and deter such conduct.

**COUNT 8**

141. Plaintiff refers to paragraphs 1-104 of this Complaint and incorporates by reference the allegations of said paragraphs as though expressly set forth at length at this point.

142. Monell Policy and Supervisor Liability claim under the Ohio Constitution and Bill of Rights, the Nevada Constitution and Bill of Rights, U.S. Constitution, federal statute, state statute, and common law, against Lawrence County and Does 9 to 10.

143. The unconstitutional actions and/or omissions of John Chapman and Does 9 to 10 were pursuant to the following customs, policies, practices, and/or procedures of defendants Lawrence County and Does 9 to 10, and which were directed, encouraged, allowed and/or ratified by policymaking officials with Lawrence County and Does 9 to 10:

a. Making mandatory the disclosure of social security numbers from inmates without providing statutory authority and what the numbers will be used for;

b. Denying rights and benefits unless a social security number is provided;

c. Using position as a jailer to unnecessarily put fear of the loss of rights into inmates.

144. The totality of the circumstances of Lawrence County's consistent abuse of inmates including myself are indicative of the existence of a written or unwritten municipal policy and minimally a longstanding practice. Discovery will show further proof.

145. I was harmed as a direct and proximate result by violations a – c and those harms are enumerated in the separate claims for each primary claim.

146. Defendants' malicious, oppressive, and despicable conduct, carried out in a full and conscious disregard for my rights and safety entitles Plaintiff to punitive damages and penalties allowable under 42 U.S.C. § 1983 and Ohio and Nevada law in an amount sufficient to punish and deter such conduct.

## COUNT 9

147. Plaintiff refers to paragraphs 1-104 of this Complaint and incorporates by reference the allegations of said paragraphs as though expressly set forth at length at this point.

148. Monell Policy and Supervisor Liability claim under the Ohio Constitution and Bill of Rights, the Nevada Constitution and Bill of Rights, U.S. Constitution, federal statute, state statute, and common law, against Doe Government Entity and Doe # 8.

143. The unconstitutional actions and/or omissions of John Chapman and Does 9 to 10 were pursuant to the following customs, policies, practices, and/or procedures of defendants Lawrence County and Does 9 to 10, and which were directed, encouraged, allowed and/or ratified by policymaking officials with Lawrence County and Does 9 to 10:

a. Making mandatory the disclosure of social security numbers from inmates without providing statutory authority and what the numbers will be used for;

b. Denying rights and benefits unless a social security number is provided;

c. Using position as a jailer to unnecessarily put fear of the loss of rights into inmates.

144. The totality of the circumstances of Lawrence County's consistent abuse of inmates including myself are indicative of the existence of a written or unwritten municipal policy and minimally a longstanding practice. Discovery will show further proof.

145. I was harmed as a direct and proximate result by violations a – c and those harms are enumerated in the separate claims for each primary claim.

146. Defendants' malicious, oppressive, and despicable conduct, carried out in a full and conscious disregard for my rights and safety entitles Plaintiff to punitive damages and penalties allowable under 42 U.S.C. § 1983 and Ohio and Nevada law in an amount sufficient to punish and deter such conduct.

**COUNT 9**

147. Plaintiff refers to paragraphs 1-104 of this Complaint and incorporates by reference the allegations of said paragraphs as though expressly set forth at length at this point.

148. Monell Policy and Supervisor Liability claim under the Ohio Constitution and Bill of Rights, the Nevada Constitution and Bill of Rights, U.S. Constitution, federal statute, state statute, and common law, against Doe Government Entity and Doe # 8.

149. The unconstitutional actions and/or omissions of Sarah were pursuant to the following customs, policies, practices, and/or procedures of defendants Doe Government Entity and Doe # 8, and which were directed, encouraged, allowed and/or ratified by policymaking officials with Doe Government Entity and Doe # 8:

a. Allowing and or authorizing employees to make defamatory phone calls to third parties in retaliation for the exercise of First Amendment Rights including freedom of the press and freedom of speech.

150. The totality of the circumstances of Doe Government Entity's consistent misconduct including against myself are indicative of the existence of a written or unwritten municipal policy and minimally a longstanding practice. Discovery will show further proof.

151. I was harmed as a direct and proximate result by violations and those harms are enumerated in the separate claims for each primary claim.

152. Defendants' malicious, oppressive, and despicable conduct, carried out in a full and conscious disregard for my rights and safety entitles Plaintiff to punitive damages and penalties allowable under 42 U.S.C. § 1983 and Ohio and Nevada law in an amount sufficient to punish and deter such conduct.

**COUNT 10**

153. Plaintiff refers to paragraphs 1-104 of this Complaint and incorporates by reference the allegations of said paragraphs as though expressly set forth at length at this point.

154. Selective enforcement and inequal police action under the Ohio Constitution and Bill of Rights, the Nevada Constitution and Bill of Rights, U.S. Constitution, federal statute, state statute, and common law, against Pam Wagner, Brad Spoljaric, Chance Blankenship, Evan McKnight, Robert Fouch, and Does 1 to 7.

149. The unconstitutional actions and/or omissions of Sarah were pursuant to the following customs, policies, practices, and/or procedures of defendants Doe Government Entity and Doe # 8, and which were directed, encouraged, allowed and/or ratified by policymaking officials with Doe Government Entity and Doe # 8:

a. Allowing and or authorizing employees to make defamatory phone calls to third parties in retaliation for the exercise of First Amendment Rights including freedom of the press and freedom of speech.

150. The totality of the circumstances of Doe Government Entity's consistent misconduct including against myself are indicative of the existence of a written or unwritten municipal policy and minimally a longstanding practice. Discovery will show further proof.

151. I was harmed as a direct and proximate result by violations and those harms are enumerated in the separate claims for each primary claim.

152. Defendants' malicious, oppressive, and despicable conduct, carried out in a full and conscious disregard for my rights and safety entitles Plaintiff to punitive damages and penalties allowable under 42 U.S.C. § 1983 and Ohio and Nevada law in an amount sufficient to punish and deter such conduct.

**COUNT 10**

153. Plaintiff refers to paragraphs 1-104 of this Complaint and incorporates by reference the allegations of said paragraphs as though expressly set forth at length at this point.

154. Selective enforcement and inequal police action under the Ohio Constitution and Bill of Rights, the Nevada Constitution and Bill of Rights, U.S. Constitution, federal statute, state statute, and common law, against Pam Wagner, Brad Spoljaric, Chance Blankenship, Evan McKnight, Robert Fouch, and Does 1 to 7.

155. The totality of the allegations shows that defendants selectively enforced laws against people with criminal records, against people that expressed criticism towards law enforcement, and against those publicizing information on Police misconduct. The allegations also show the effect of the discrimination under the totality of the circumstances but also directly in that Cramblit was released at the scene of his OVI without being taken to jail, and at the failure of defendants to arrest other citizens that were in the Ironton City Hall when I was arrested.

156. I was harmed as a direct and proximate result by having to refrain from exercising my rights, the government suppressing dissent, and loss of public participation. I also experienced, as a direct and proximate result, the negative psychological and emotional impact of the abuse and the chilling effect that this had on the future exercise of my rights for fear of further abuse.

157. I was further harmed, as a direct and proximate result, by the unlawful arrest, excessive force, battery, unlawful search, and abuse of process and those harms are enumerated under those primary claims.

158. Defendants' malicious, oppressive, and despicable conduct, carried out in a full and conscious disregard for my rights and safety entitles Plaintiff to punitive damages and penalties allowable under 42 U.S.C. § 1983 and Ohio and Nevada law in an amount sufficient to punish and deter such conduct.

**COUNT 11**

159. Plaintiff refers to paragraphs 1-104 of this Complaint and incorporates by reference the allegations of said paragraphs as though expressly set forth at length at this point.

160. Battery under the Ohio Constitution and Bill of Rights, the Nevada Constitution and Bill of Rights, U.S. Constitution, federal statute, state statute, and common law, against Evan McKnight.

155. The totality of the allegations shows that defendants selectively enforced laws against people with criminal records, against people that expressed criticism towards law enforcement, and against those publicizing information on Police misconduct. The allegations also show the effect of the discrimination under the totality of the circumstances but also directly in that Cramblit was released at the scene of his OVI without being taken to jail, and at the failure of defendants to arrest other citizens that were in the Ironton City Hall when I was arrested.

156. I was harmed as a direct and proximate result by having to refrain from exercising my rights, the government suppressing dissent, and loss of public participation. I also experienced, as a direct and proximate result, the negative psychological and emotional impact of the abuse and the chilling effect that this had on the future exercise of my rights for fear of further abuse.

157. I was further harmed, as a direct and proximate result, by the unlawful arrest, excessive force, battery, unlawful search, and abuse of process and those harms are enumerated under those primary claims.

158. Defendants' malicious, oppressive, and despicable conduct, carried out in a full and conscious disregard for my rights and safety entitles Plaintiff to punitive damages and penalties allowable under 42 U.S.C. § 1983 and Ohio and Nevada law in an amount sufficient to punish and deter such conduct.

**COUNT 11**

159. Plaintiff refers to paragraphs 1-104 of this Complaint and incorporates by reference the allegations of said paragraphs as though expressly set forth at length at this point.

160. Battery under the Ohio Constitution and Bill of Rights, the Nevada Constitution and Bill of Rights, U.S. Constitution, federal statute, state statute, and common law, against Evan McKnight.

161. The factual allegations show that defendant intentionally, and without consent or legal justification, touched Plaintiff in a harmful and offensive manner.

162. I was harmed as a direct and proximate result by feeling physical pain and discomfort, negative psychological and emotional impact of being battered and the chilling effect that this had on the future exercise of my rights for fear of further abuse.

163. Defendants' malicious, oppressive, and despicable conduct, carried out in a full and conscious disregard for my rights and safety entitles Plaintiff to punitive damages and penalties allowable under 42 U.S.C. § 1983 and Ohio and Nevada law in an amount sufficient to punish and deter such conduct.

**COUNT 12**

164. Plaintiff refers to paragraphs 1-104 of this Complaint and incorporates by reference the allegations of said paragraphs as though expressly set forth at length at this point.

165. Monell Failure to Train under the Ohio Constitution and Bill of Rights, the Nevada Constitution and Bill of Rights, U.S. Constitution, federal statute, state statute, and common law, against Doe Government Entity.

166. Defendant failed to properly screen, hire, train, instruct, monitor, supervise, evaluate, investigate, discipline and/or terminate defendants Sarah and Doe #8, with deliberate indifference to Plaintiff's constitutional rights in the following manner:

a. To fail to institute, require, and enforce proper and adequate training, supervision, policies, and procedures concerning engaging in defamation in retaliation of those exercising their First Amendment rights;

b. To fail to institute, require, and enforce proper and adequate training, supervision, policies, and procedures within the government entity concerning the fear experienced by people

161. The factual allegations show that defendant intentionally, and without consent or legal justification, touched Plaintiff in a harmful and offensive manner.

162. I was harmed as a direct and proximate result by feeling physical pain and discomfort, negative psychological and emotional impact of being battered and the chilling effect that this had on the future exercise of my rights for fear of further abuse.

163. Defendants' malicious, oppressive, and despicable conduct, carried out in a full and conscious disregard for my rights and safety entitles Plaintiff to punitive damages and penalties allowable under 42 U.S.C. § 1983 and Ohio and Nevada law in an amount sufficient to punish and deter such conduct.

**COUNT 12**

164. Plaintiff refers to paragraphs 1-104 of this Complaint and incorporates by reference the allegations of said paragraphs as though expressly set forth at length at this point.

165. Monell Failure to Train under the Ohio Constitution and Bill of Rights, the Nevada Constitution and Bill of Rights, U.S. Constitution, federal statute, state statute, and common law, against Doe Government Entity.

166. Defendant failed to properly screen, hire, train, instruct, monitor, supervise, evaluate, investigate, discipline and/or terminate defendants Sarah and Doe #8, with deliberate indifference to Plaintiff's constitutional rights in the following manner:

a. To fail to institute, require, and enforce proper and adequate training, supervision, policies, and procedures concerning engaging in defamation in retaliation of those exercising their First Amendment rights;

b. To fail to institute, require, and enforce proper and adequate training, supervision, policies, and procedures within the government entity concerning the fear experienced by people

of different minorities (including cop watching activists) when interacting with government employees in light of well documented, highly publicized, and disproportionate amount of discrimination committed by government employees against said groups, and the tactics that employees should employ in dealing with said groups in light of such fears (especially where, as here, they have been explicitly made known to the employees);

c. To ignore and/or fail to properly investigate, supervise, discipline, and/or terminate employees who have engaged in unlawful or unconstitutional activities.

167. The totality of the circumstances of Doe Government Entity's consistent misconduct including against myself are indicative of a Monell failure to train liability. Discovery will show further proof.

168. I was harmed as a direct and proximate result by violations and those harms are enumerated in the separate claims for each primary claim.

169. Defendants' malicious, oppressive, and despicable conduct, carried out in a full and conscious disregard for my rights and safety entitles Plaintiff to punitive damages and penalties allowable under 42 U.S.C. § 1983 and Ohio and Nevada law in an amount sufficient to punish and deter such conduct.

**COUNT 13**

170. Plaintiff refers to paragraphs 1-104 of this Complaint and incorporates by reference the allegations of said paragraphs as though expressly set forth at length at this point.

171. Invasion of privacy under the Ohio Constitution and Bill of Rights, the Nevada Constitution and Bill of Rights, U.S. Constitution, federal statute, state statute, and common law, against Pam Wagner, Brad Spoljaric, Chance Blankenship, Evan McKnight, Robert Fouch, and Does 1 to 7.

of different minorities (including cop watching activists) when interacting with government employees in light of well documented, highly publicized, and disproportionate amount of discrimination committed by government employees against said groups, and the tactics that employees should employ in dealing with said groups in light of such fears (especially where, as here, they have been explicitly made known to the employees);

c. To ignore and/or fail to properly investigate, supervise, discipline, and/or terminate employees who have engaged in unlawful or unconstitutional activities.

167. The totality of the circumstances of Doe Government Entity's consistent misconduct including against myself are indicative of a Monell failure to train liability. Discovery will show further proof.

168. I was harmed as a direct and proximate result by violations and those harms are enumerated in the separate claims for each primary claim.

169. Defendants' malicious, oppressive, and despicable conduct, carried out in a full and conscious disregard for my rights and safety entitles Plaintiff to punitive damages and penalties allowable under 42 U.S.C. § 1983 and Ohio and Nevada law in an amount sufficient to punish and deter such conduct.

**COUNT 13**

170. Plaintiff refers to paragraphs 1-104 of this Complaint and incorporates by reference the allegations of said paragraphs as though expressly set forth at length at this point.

171. Invasion of privacy under the Ohio Constitution and Bill of Rights, the Nevada Constitution and Bill of Rights, U.S. Constitution, federal statute, state statute, and common law, against Pam Wagner, Brad Spoljaric, Chance Blankenship, Evan McKnight, Robert Fouch, and Does 1 to 7.

172. During the incident giving rise to this action, Plaintiff had a reasonable expectation of privacy in his personal affairs, including the contents of his personal belongings such as vehicles, pockets, wallets, cell phones and other electronic devices.

173. In doing the things herein alleged, defendants intentionally invaded and intruded into Plaintiff's personal and private affairs by searching his belongings without a warrant or other legal justification.

174. Defendants' invasion of Plaintiff's privacy would have been offensive to any reasonable person.

175. I was harmed as a direct and proximate result by the violation of my privacy of the contents of my person, by the negative psychological and emotional impact on my rights being violated and the chilling effect that this had on the future exercise of my rights for fear of further abuse.

176. Defendants' malicious, oppressive, and despicable conduct, carried out in a full and conscious disregard for my rights and safety entitles Plaintiff to punitive damages and penalties allowable under 42 U.S.C. § 1983 and Ohio and Nevada law in an amount sufficient to punish and deter such conduct.

**COUNT 14**

177. Plaintiff refers to paragraphs 1-104 of this Complaint and incorporates by reference the allegations of said paragraphs as though expressly set forth at length at this point.

178. Negligence under the Ohio Constitution and Bill of Rights, the Nevada Constitution and Bill of Rights, U.S. Constitution, federal statute, state statute, and common law, against all individual defendants.

179. The individual defendants owed Plaintiff a duty to use reasonable care in connection

172. During the incident giving rise to this action, Plaintiff had a reasonable expectation of privacy in his personal affairs, including the contents of his personal belongings such as vehicles, pockets, wallets, cell phones and other electronic devices.

173. In doing the things herein alleged, defendants intentionally invaded and intruded into Plaintiff's personal and private affairs by searching his belongings without a warrant or other legal justification.

174. Defendants' invasion of Plaintiff's privacy would have been offensive to any reasonable person.

175. I was harmed as a direct and proximate result by the violation of my privacy of the contents of my person, by the negative psychological and emotional impact on my rights being violated and the chilling effect that this had on the future exercise of my rights for fear of further abuse.

176. Defendants' malicious, oppressive, and despicable conduct, carried out in a full and conscious disregard for my rights and safety entitles Plaintiff to punitive damages and penalties allowable under 42 U.S.C. § 1983 and Ohio and Nevada law in an amount sufficient to punish and deter such conduct.

**COUNT 14**

177. Plaintiff refers to paragraphs 1-104 of this Complaint and incorporates by reference the allegations of said paragraphs as though expressly set forth at length at this point.

178. Negligence under the Ohio Constitution and Bill of Rights, the Nevada Constitution and Bill of Rights, U.S. Constitution, federal statute, state statute, and common law, against all individual defendants.

179. The individual defendants owed Plaintiff a duty to use reasonable care in connection

with the parties' interactions as described herein. In particular, said defendants had a duty to carefully investigate any criminal activity, to use care to avoid subjecting Plaintiff to an illegal detention, arrest, seizure, retaliation for exercise of free speech, free press, or petition for redress of grievances, use of force, or deprivation of any of the other rights enumerated herein, and to use reasonable care to avoid engaging in biased policing or racial and political affiliation profiling.

180. In doing the things herein alleged, defendants breached the applicable duty of care by acting unreasonably, carelessly, negligently and/or recklessly.

181. As a direct and proximate result of defendants' conduct, Plaintiff suffered injuries and damages as set forth above in the separately enumerated primary claims.

182. Defendants' malicious, oppressive, and despicable conduct, carried out in a full and conscious disregard for my rights and safety entitles Plaintiff to punitive damages and penalties allowable under 42 U.S.C. § 1983 and Ohio and Nevada law in an amount sufficient to punish and deter such conduct.

**COUNT 15**

183. Plaintiff refers to paragraphs 1-104 of this Complaint and incorporates by reference the allegations of said paragraphs as though expressly set forth at length at this point.

184. Monell Failure to Train under the Ohio Constitution and Bill of Rights, the Nevada Constitution and Bill of Rights, U.S. Constitution, federal statute, state statute, and common law, against Lawrence County.

185. Defendant failed to properly screen, hire, train, instruct, monitor, supervise, evaluate, investigate, discipline and/or terminate defendants John Chapman and Does 9 - 10, with deliberate indifference to Plaintiff's constitutional rights in the following manner:

with the parties' interactions as described herein. In particular, said defendants had a duty to carefully investigate any criminal activity, to use care to avoid subjecting Plaintiff to an illegal detention, arrest, seizure, retaliation for exercise of free speech, free press, or petition for redress of grievances, use of force, or deprivation of any of the other rights enumerated herein, and to use reasonable care to avoid engaging in biased policing or racial and political affiliation profiling.

180. In doing the things herein alleged, defendants breached the applicable duty of care by acting unreasonably, carelessly, negligently and/or recklessly.

181. As a direct and proximate result of defendants' conduct, Plaintiff suffered injuries and damages as set forth above in the separately enumerated primary claims.

182. Defendants' malicious, oppressive, and despicable conduct, carried out in a full and conscious disregard for my rights and safety entitles Plaintiff to punitive damages and penalties allowable under 42 U.S.C. § 1983 and Ohio and Nevada law in an amount sufficient to punish and deter such conduct.

**COUNT 15**

183. Plaintiff refers to paragraphs 1-104 of this Complaint and incorporates by reference the allegations of said paragraphs as though expressly set forth at length at this point.

184. Monell Failure to Train under the Ohio Constitution and Bill of Rights, the Nevada Constitution and Bill of Rights, U.S. Constitution, federal statute, state statute, and common law, against Lawrence County.

185. Defendant failed to properly screen, hire, train, instruct, monitor, supervise, evaluate, investigate, discipline and/or terminate defendants John Chapman and Does 9 - 10, with deliberate indifference to Plaintiff's constitutional rights in the following manner:

a. To fail to institute, require, and enforce proper and adequate training, supervision, policies, and procedures concerning engaging in defamation in retaliation of those exercising their First Amendment rights;

b. To fail to institute, require, and enforce proper and adequate training, supervision, policies, and procedures within the government entity concerning the fear experienced by people of different minorities (including cop watching activists) when interacting with government employees in light of well documented, highly publicized, and disproportionate amount of discrimination committed by government employees against said groups, and the tactics that employees should employ in dealing with said groups in light of such fears (especially where, as here, they have been explicitly made known to the employees);

c. To ignore and/or fail to properly investigate, supervise, discipline, and/or terminate employees who have engaged in unlawful or unconstitutional activities.

186. The totality of the circumstances of Lawrence County's consistent misconduct including against myself are indicative of a Monell failure to train liability. Discovery will show further proof.

187. I was harmed as a direct and proximate result by violations and those harms are enumerated in the separate claims for each primary claim.

188. Defendants' malicious, oppressive, and despicable conduct, carried out in a full and conscious disregard for my rights and safety entitles Plaintiff to punitive damages and penalties allowable under 42 U.S.C. § 1983 and Ohio and Nevada law in an amount sufficient to punish and deter such conduct.

**COUNT 16**

189. Plaintiff refers to paragraphs 1-104 of this Complaint and incorporates by reference

a. To fail to institute, require, and enforce proper and adequate training, supervision, policies, and procedures concerning engaging in defamation in retaliation of those exercising their First Amendment rights;

b. To fail to institute, require, and enforce proper and adequate training, supervision, policies, and procedures within the government entity concerning the fear experienced by people of different minorities (including cop watching activists) when interacting with government employees in light of well documented, highly publicized, and disproportionate amount of discrimination committed by government employees against said groups, and the tactics that employees should employ in dealing with said groups in light of such fears (especially where, as here, they have been explicitly made known to the employees);

c. To ignore and/or fail to properly investigate, supervise, discipline, and/or terminate employees who have engaged in unlawful or unconstitutional activities.

186. The totality of the circumstances of Lawrence County's consistent misconduct including against myself are indicative of a Monell failure to train liability. Discovery will show further proof.

187. I was harmed as a direct and proximate result by violations and those harms are enumerated in the separate claims for each primary claim.

188. Defendants' malicious, oppressive, and despicable conduct, carried out in a full and conscious disregard for my rights and safety entitles Plaintiff to punitive damages and penalties allowable under 42 U.S.C. § 1983 and Ohio and Nevada law in an amount sufficient to punish and deter such conduct.

**COUNT 16**

189. Plaintiff refers to paragraphs 1-104 of this Complaint and incorporates by reference

the allegations of said paragraphs as though expressly set forth at length at this point.

190. Failure to intervene under the Ohio Constitution and Bill of Rights, the Nevada Constitution and Bill of Rights, U.S. Constitution, federal statute, state statute, and common law, against all individual defendants.

191. The factual allegations show that the individual defendants had a 1) a realistic opportunity to intervene to prevent harm; 2) a reasonable person in the defendant's position would have known that my constitutional rights were being violated; and 3) the defendants did not take reasonable steps to intervene.

192. I was harmed as a direct and proximate result by violations and those harms are enumerated in the separate claims for each primary claim.

193. Defendants' malicious, oppressive, and despicable conduct, carried out in a full and conscious disregard for my rights and safety entitles Plaintiff to punitive damages and penalties allowable under 42 U.S.C. § 1983 and Ohio and Nevada law in an amount sufficient to punish and deter such conduct.

**COUNT 17**

194. Plaintiff refers to paragraphs 1-104 of this Complaint and incorporates by reference the allegations of said paragraphs as though expressly set forth at length at this point.

195. Civil conspiracy and racketeering under the Ohio Constitution and Bill of Rights, the Nevada Constitution and Bill of Rights, U.S. Constitution, federal statute, state statute, and common law, against all individual defendants.

196. The totality of the circumstances show that 1) there was an agreement between defendants to violate my civil rights, defame me, and batter me; 2) there was a single plan that the defendants shared; 3) that defendants committed at least one overt act in furtherance of the

the allegations of said paragraphs as though expressly set forth at length at this point.

190. Failure to intervene under the Ohio Constitution and Bill of Rights, the Nevada Constitution and Bill of Rights, U.S. Constitution, federal statute, state statute, and common law, against all individual defendants.

191. The factual allegations show that the individual defendants had a 1) a realistic opportunity to intervene to prevent harm; 2) a reasonable person in the defendant's position would have known that my constitutional rights were being violated; and 3) the defendants did not take reasonable steps to intervene.

192. I was harmed as a direct and proximate result by violations and those harms are enumerated in the separate claims for each primary claim.

193. Defendants' malicious, oppressive, and despicable conduct, carried out in a full and conscious disregard for my rights and safety entitles Plaintiff to punitive damages and penalties allowable under 42 U.S.C. § 1983 and Ohio and Nevada law in an amount sufficient to punish and deter such conduct.

**COUNT 17**

194. Plaintiff refers to paragraphs 1-104 of this Complaint and incorporates by reference the allegations of said paragraphs as though expressly set forth at length at this point.

195. Civil conspiracy and racketeering under the Ohio Constitution and Bill of Rights, the Nevada Constitution and Bill of Rights, U.S. Constitution, federal statute, state statute, and common law, against all individual defendants.

196. The totality of the circumstances show that 1) there was an agreement between defendants to violate my civil rights, defame me, and batter me; 2) there was a single plan that the defendants shared; 3) that defendants committed at least one overt act in furtherance of the

conspiracy; and 4) I was harmed by that conspiracy. Discovery will show further proof.

197. I was harmed, as a direct and proximate result, by the underlying crimes as enumerated in the separate primary claims.

198. Defendants' malicious, oppressive, and despicable conduct, carried out in a full and conscious disregard for my rights and safety entitles Plaintiff to punitive damages and penalties allowable under 42 U.S.C. § 1983 and Ohio and Nevada law in an amount sufficient to punish and deter such conduct.

**COUNT 18**

199. Plaintiff refers to paragraphs 1-104 of this Complaint and incorporates by reference the allegations of said paragraphs as though expressly set forth at length at this point.

200. Abuse of power of a jailer under the Ohio Constitution, U.S. Constitution, federal statute, state statute, and common law, against John Chapman.

201. The factual allegations show that John Chapman employed his power of a jailer over an inmate in an extravagant manner, contrary to the law of its use, improperly, and to excess.

202. I was harmed as a direct and proximate result by being deprived of my liberty for a period of time, being unable to do what I wanted or go where I wanted. I was harmed as a direct and proximate result by having to refrain from exercising my rights, the government suppressing dissent, and loss of public participation. I also experienced, as a direct and proximate result, the negative psychological and emotional impact of the abuse and the chilling effect that this had on the future exercise of my rights for fear of further abuse.

203. Defendants' malicious, oppressive, and despicable conduct, carried out in a full and conscious disregard for my rights and safety entitles Plaintiff to punitive damages and penalties allowable under 42 U.S.C. § 1983 and Ohio and Nevada law in an amount sufficient to punish

conspiracy; and 4) I was harmed by that conspiracy. Discovery will show further proof.

197. I was harmed, as a direct and proximate result, by the underlying crimes as enumerated in the separate primary claims.

198. Defendants' malicious, oppressive, and despicable conduct, carried out in a full and conscious disregard for my rights and safety entitles Plaintiff to punitive damages and penalties allowable under 42 U.S.C. § 1983 and Ohio and Nevada law in an amount sufficient to punish and deter such conduct.

**COUNT 18**

199. Plaintiff refers to paragraphs 1-104 of this Complaint and incorporates by reference the allegations of said paragraphs as though expressly set forth at length at this point.

200. Abuse of power of a jailer under the Ohio Constitution, U.S. Constitution, federal statute, state statute, and common law, against John Chapman.

201. The factual allegations show that John Chapman employed his power of a jailer over an inmate in an extravagant manner, contrary to the law of its use, improperly, and to excess.

202. I was harmed as a direct and proximate result by being deprived of my liberty for a period of time, being unable to do what I wanted or go where I wanted. I was harmed as a direct and proximate result by having to refrain from exercising my rights, the government suppressing dissent, and loss of public participation. I also experienced, as a direct and proximate result, the negative psychological and emotional impact of the abuse and the chilling effect that this had on the future exercise of my rights for fear of further abuse.

203. Defendants' malicious, oppressive, and despicable conduct, carried out in a full and conscious disregard for my rights and safety entitles Plaintiff to punitive damages and penalties allowable under 42 U.S.C. § 1983 and Ohio and Nevada law in an amount sufficient to punish

and deter such conduct.

**COUNT 19**

204. Plaintiff refers to paragraphs 1-104 of this Complaint and incorporates by reference the allegations of said paragraphs as though expressly set forth at length at this point.

205. Abuse of process under the Ohio Constitution and Bill of Rights, the Nevada Constitution and Bill of Rights, U.S. Constitution, federal statute, state statute, and common law, against Pam Wagner, Brad Spoljaric, Chance Blankenship, Evan McKnight, Robert Fouch, and Does 1 to 7.

206. The factual allegations show that defendants 1) initiated process to achieve an unlawful purpose; and 2) denying me due process.

207. I was harmed as a direct and proximate result by being deprived of my liberty for a period of time, being unable to do what I wanted or go where I wanted. I further had to initiate a costly defense. My daily life was disrupted by the defendants as a direct and proximate result. I was harmed as a direct and proximate result by having to refrain from exercising my rights, the government suppressing dissent, and loss of public participation. I also experienced, as a direct and proximate result, the negative psychological and emotional impact of being battered and the chilling effect that this had on the future exercise of my rights for fear of further abuse. I was harmed as a direct and proximate result by being deprived of my liberty for a period of time, being unable to do what I wanted or go where I wanted.

208. Defendants' malicious, oppressive, and despicable conduct, carried out in a full and conscious disregard for my rights and safety entitles Plaintiff to punitive damages and penalties allowable under 42 U.S.C. § 1983 and Ohio and Nevada law in an amount sufficient to punish and deter such conduct.

and deter such conduct.

**COUNT 19**

204. Plaintiff refers to paragraphs 1-104 of this Complaint and incorporates by reference the allegations of said paragraphs as though expressly set forth at length at this point.

205. Abuse of process under the Ohio Constitution and Bill of Rights, the Nevada Constitution and Bill of Rights, U.S. Constitution, federal statute, state statute, and common law, against Pam Wagner, Brad Spoljaric, Chance Blankenship, Evan McKnight, Robert Fouch, and Does 1 to 7.

206. The factual allegations show that defendants 1) initiated process to achieve an unlawful purpose; and 2) denying me due process.

207. I was harmed as a direct and proximate result by being deprived of my liberty for a period of time, being unable to do what I wanted or go where I wanted. I further had to initiate a costly defense. My daily life was disrupted by the defendants as a direct and proximate result. I was harmed as a direct and proximate result by having to refrain from exercising my rights, the government suppressing dissent, and loss of public participation. I also experienced, as a direct and proximate result, the negative psychological and emotional impact of being battered and the chilling effect that this had on the future exercise of my rights for fear of further abuse. I was harmed as a direct and proximate result by being deprived of my liberty for a period of time, being unable to do what I wanted or go where I wanted.

208. Defendants' malicious, oppressive, and despicable conduct, carried out in a full and conscious disregard for my rights and safety entitles Plaintiff to punitive damages and penalties allowable under 42 U.S.C. § 1983 and Ohio and Nevada law in an amount sufficient to punish and deter such conduct.

**COUNT 20**

209. Plaintiff refers to paragraphs 1-104 of this Complaint and incorporates by reference the allegations of said paragraphs as though expressly set forth at length at this point.

210. Defamation under the Ohio Constitution and Bill of Rights, the Nevada Constitution and Bill of Rights, U.S. Constitution, federal statute, state statute, and common law, against Sarah and Doe #8.

211. The factual allegations show that Sarah and Doe #8 did share false factual statements with a third party about my committing the crime of making harassing phone calls. The totality of the facts further indicate that the defamation was done deliberately and maliciously and that the defendants knew that the defamatory statements were about me and were asserted as the truth even though they were false.

212. I was harmed as a direct and proximate result by this damaging of my reputation, which directly resulted in 1) my being harassed by trolls online; and 2) public rallies protesting against my presence in Ironton. The defamation also had a direct and proximate negative psychological and emotional impact on me.

213. Defendants' malicious, oppressive, and despicable conduct, carried out in a full and conscious disregard for my rights and safety entitles Plaintiff to punitive damages and penalties allowable under 42 U.S.C. § 1983 and Ohio and Nevada law in an amount sufficient to punish and deter such conduct.

**COUNT 21**

214. Plaintiff refers to paragraphs 1-104 of this Complaint and incorporates by reference the allegations of said paragraphs as though expressly set forth at length at this point.

215. Inequal access to rent the lobby under the Ohio Constitution and Bill of Rights, the

**COUNT 20**

209. Plaintiff refers to paragraphs 1-104 of this Complaint and incorporates by reference the allegations of said paragraphs as though expressly set forth at length at this point.

210. Defamation under the Ohio Constitution and Bill of Rights, the Nevada Constitution and Bill of Rights, U.S. Constitution, federal statute, state statute, and common law, against Sarah and Doe #8.

211. The factual allegations show that Sarah and Doe #8 did share false factual statements with a third party about my committing the crime of making harassing phone calls. The totality of the facts further indicate that the defamation was done deliberately and maliciously and that the defendants knew that the defamatory statements were about me and were asserted as the truth even though they were false.

212. I was harmed as a direct and proximate result by this damaging of my reputation, which directly resulted in 1) my being harassed by trolls online; and 2) public rallies protesting against my presence in Ironton. The defamation also had a direct and proximate negative psychological and emotional impact on me.

213. Defendants' malicious, oppressive, and despicable conduct, carried out in a full and conscious disregard for my rights and safety entitles Plaintiff to punitive damages and penalties allowable under 42 U.S.C. § 1983 and Ohio and Nevada law in an amount sufficient to punish and deter such conduct.

**COUNT 21**

214. Plaintiff refers to paragraphs 1-104 of this Complaint and incorporates by reference the allegations of said paragraphs as though expressly set forth at length at this point.

215. Inequal access to rent the lobby under the Ohio Constitution and Bill of Rights, the

Nevada Constitution and Bill of Rights, U.S. Constitution, federal statute, state statute, and common law, against Ironton and Does 1 to 7.

216. The factual allegations show that 1) plaintiff is a member of a political affiliation that is critical of police and police corruption, which is a protected class under § 1985; 2) plaintiff was exercising his First Amendment Rights in support of his political viewpoints; and 3) defendants denied him access to use the City Hall lobby for those First Amendment Rights due to his political viewpoints.

217. I was harmed as a direct and proximate result by being arrested for trespassing. I was further harmed, as a direct and proximate result, by the unlawful arrest, excessive force, battery, unlawful search, and abuse of process and those harms are enumerated under those primary claims.

218. Defendants' malicious, oppressive, and despicable conduct, carried out in a full and conscious disregard for my rights and safety entitles Plaintiff to punitive damages and penalties allowable under 42 U.S.C. § 1983 and Ohio and Nevada law in an amount sufficient to punish and deter such conduct.

**COUNT 22**

219. Plaintiff refers to paragraphs 1-104 of this Complaint and incorporates by reference the allegations of said paragraphs as though expressly set forth at length at this point.

220. Unreasonable seizure under the Ohio Constitution and Bill of Rights, the Nevada Constitution and Bill of Rights, U.S. Constitution, federal statute, state statute, and common law, against Ironton.

221. The facts show that although Waldo justified the initial seizure of my cell phone while being arrested, under the normal and customary course of arrest, which I don't dispute. Inmates

Nevada Constitution and Bill of Rights, U.S. Constitution, federal statute, state statute, and common law, against Ironton and Does 1 to 7.

216. The factual allegations show that 1) plaintiff is a member of a political affiliation that is critical of police and police corruption, which is a protected class under § 1985; 2) plaintiff was exercising his First Amendment Rights in support of his political viewpoints; and 3) defendants denied him access to use the City Hall lobby for those First Amendment Rights due to his political viewpoints.

217. I was harmed as a direct and proximate result by being arrested for trespassing. I was further harmed, as a direct and proximate result, by the unlawful arrest, excessive force, battery, unlawful search, and abuse of process and those harms are enumerated under those primary claims.

218. Defendants' malicious, oppressive, and despicable conduct, carried out in a full and conscious disregard for my rights and safety entitles Plaintiff to punitive damages and penalties allowable under 42 U.S.C. § 1983 and Ohio and Nevada law in an amount sufficient to punish and deter such conduct.

**COUNT 22**

219. Plaintiff refers to paragraphs 1-104 of this Complaint and incorporates by reference the allegations of said paragraphs as though expressly set forth at length at this point.

220. Unreasonable seizure under the Ohio Constitution and Bill of Rights, the Nevada Constitution and Bill of Rights, U.S. Constitution, federal statute, state statute, and common law, against Ironton.

221. The facts show that although Waldo justified the initial seizure of my cell phone while being arrested, under the normal and customary course of arrest, which I don't dispute. Inmates

usually aren't allowed to bring their cell phone with them to jail. However, the facts show that my cell phone was not used to facilitate trespass, disorderly conduct, or resisting arrest. Nor was my cell phone returned to me when I was released from Jail. Further, my cell phone was not returned to me until two weeks after Waldo ordered that it be returned to me. When it was returned, all of it was not returned, it was damaged, and it was left in an unusable state.

222. Since the phone contained video in the exercise of my First Amendment rights of free speech, and it contained contacts and text messages valuable to my investigation into government corruption, this was a blatant attempt to harm not only my civil rights but the civil rights of others. This was despicable and malicious. I was harmed as a direct and proximate result by having to refrain from exercising my rights, the government suppressing dissent, and loss of public participation. I also experienced, as a direct and proximate result, the negative psychological and emotional impact of the abuse and the chilling effect that this had on the future exercise of my rights for fear of further abuse. Further, as a direct and proximate result, I had to initially rent a phone and then replace the phone.

223. Defendants' malicious, oppressive, and despicable conduct, carried out in a full and conscious disregard for my rights and safety entitles Plaintiff to punitive damages and penalties allowable under 42 U.S.C. § 1983 and Ohio and Nevada law in an amount sufficient to punish and deter such conduct.

**COUNT 23**

224. Plaintiff refers to paragraphs 1-104 of this Complaint and incorporates by reference the allegations of said paragraphs as though expressly set forth at length at this point.

225. Conversion under the Ohio Constitution and Bill of Rights, the Nevada Constitution and Bill of Rights, U.S. Constitution, federal statute, state statute, and common law, against

usually aren't allowed to bring their cell phone with them to jail. However, the facts show that my cell phone was not used to facilitate trespass, disorderly conduct, or resisting arrest. Nor was my cell phone returned to me when I was released from Jail. Further, my cell phone was not returned to me until two weeks after Waldo ordered that it be returned to me. When it was returned, all of it was not returned, it was damaged, and it was left in an unusable state.

222. Since the phone contained video in the exercise of my First Amendment rights of free speech, and it contained contacts and text messages valuable to my investigation into government corruption, this was a blatant attempt to harm not only my civil rights but the civil rights of others. This was despicable and malicious. I was harmed as a direct and proximate result by having to refrain from exercising my rights, the government suppressing dissent, and loss of public participation. I also experienced, as a direct and proximate result, the negative psychological and emotional impact of the abuse and the chilling effect that this had on the future exercise of my rights for fear of further abuse. Further, as a direct and proximate result, I had to initially rent a phone and then replace the phone.

223. Defendants' malicious, oppressive, and despicable conduct, carried out in a full and conscious disregard for my rights and safety entitles Plaintiff to punitive damages and penalties allowable under 42 U.S.C. § 1983 and Ohio and Nevada law in an amount sufficient to punish and deter such conduct.

**COUNT 23**

224. Plaintiff refers to paragraphs 1-104 of this Complaint and incorporates by reference the allegations of said paragraphs as though expressly set forth at length at this point.

225. Conversion under the Ohio Constitution and Bill of Rights, the Nevada Constitution and Bill of Rights, U.S. Constitution, federal statute, state statute, and common law, against

Ironton.

226. The facts show that although Waldo justified the initial seizure of my cell phone while being arrested, under the normal and customary course of arrest, which I don't dispute. Inmates usually aren't allowed to bring their cell phone with them to jail. However, the facts show that my cell phone was not used to facilitate trespass, disorderly conduct, or resisting arrest. Nor was my cell phone returned to me when I was released from Jail. Further, my cell phone was not returned to me until two weeks after Waldo ordered that it be returned to me. When it was returned, all of it was not returned, it was damaged, and it was left in an unusable state.

227. Since the phone contained video in the exercise of my First Amendment rights of free speech, and it contained contacts and text messages valuable to my investigation into government corruption, this was a blatant attempt to harm not only my civil rights but the civil rights of others. This was despicable and malicious. I was harmed as a direct and proximate result by having to refrain from exercising my rights, the government suppressing dissent, and loss of public participation. I also experienced, as a direct and proximate result, the negative psychological and emotional impact of the abuse and the chilling effect that this had on the future exercise of my rights for fear of further abuse. Further, as a direct and proximate result, I had to initially rent a phone and then replace the phone.

228. Defendants' malicious, oppressive, and despicable conduct, carried out in a full and conscious disregard for my rights and safety entitles Plaintiff to punitive damages and penalties allowable under 42 U.S.C. § 1983 and Ohio and Nevada law in an amount sufficient to punish and deter such conduct.

**COUNT 24**

229. Plaintiff refers to paragraphs 1-104 of this Complaint and incorporates by reference

Ironton.

226. The facts show that although Waldo justified the initial seizure of my cell phone while being arrested, under the normal and customary course of arrest, which I don't dispute. Inmates usually aren't allowed to bring their cell phone with them to jail. However, the facts show that my cell phone was not used to facilitate trespass, disorderly conduct, or resisting arrest. Nor was my cell phone returned to me when I was released from Jail. Further, my cell phone was not returned to me until two weeks after Waldo ordered that it be returned to me. When it was returned, all of it was not returned, it was damaged, and it was left in an unusable state.

227. Since the phone contained video in the exercise of my First Amendment rights of free speech, and it contained contacts and text messages valuable to my investigation into government corruption, this was a blatant attempt to harm not only my civil rights but the civil rights of others. This was despicable and malicious. I was harmed as a direct and proximate result by having to refrain from exercising my rights, the government suppressing dissent, and loss of public participation. I also experienced, as a direct and proximate result, the negative psychological and emotional impact of the abuse and the chilling effect that this had on the future exercise of my rights for fear of further abuse. Further, as a direct and proximate result, I had to initially rent a phone and then replace the phone.

228. Defendants' malicious, oppressive, and despicable conduct, carried out in a full and conscious disregard for my rights and safety entitles Plaintiff to punitive damages and penalties allowable under 42 U.S.C. § 1983 and Ohio and Nevada law in an amount sufficient to punish and deter such conduct.

**COUNT 24**

229. Plaintiff refers to paragraphs 1-104 of this Complaint and incorporates by reference

the allegations of said paragraphs as though expressly set forth at length at this point.

230. Denial of rights and benefits for failure to provide social security number under the Ohio Constitution and Bill of Rights, the Nevada Constitution and Bill of Rights, U.S. Constitution, federal statute, state statute, and common law, against John Chapman.

231. The facts show that John Chapman did make it mandatory for me to provide my social security number, did not provide a statutory authority when doing so, did not say how the social security number would be used, and did willfully and maliciously deny me federal benefits and civil rights as a result of my refusal to provide my social security number.

232. I was harmed as a direct and proximate result by having to refrain from exercising my rights, the government suppressing dissent, and loss of public participation. I also experienced, as a direct and proximate result, the negative psychological and emotional impact of being threatened and the chilling effect that this had on the future exercise of my rights for fear of further abuse. I was harmed as a direct and proximate result by being deprived of my liberty for a period of time, being unable to do what I wanted or go where I wanted. I was harmed as a direct and proximate result by the delay of receiving federal benefits including food, drink, bedding, telephone, and restroom facilities that an inmate would normally enjoy.

233. Defendants' malicious, oppressive, and despicable conduct, carried out in a full and conscious disregard for my rights and safety entitles Plaintiff to punitive damages and penalties allowable under 42 U.S.C. § 1983 and Ohio and Nevada law in an amount sufficient to punish and deter such conduct.

**COUNT 25**

234. Plaintiff refers to paragraphs 1-104 of this Complaint and incorporates by reference the allegations of said paragraphs as though expressly set forth at length at this point.

the allegations of said paragraphs as though expressly set forth at length at this point.

230. Denial of rights and benefits for failure to provide social security number under the Ohio Constitution and Bill of Rights, the Nevada Constitution and Bill of Rights, U.S. Constitution, federal statute, state statute, and common law, against John Chapman.

231. The facts show that John Chapman did make it mandatory for me to provide my social security number, did not provide a statutory authority when doing so, did not say how the social security number would be used, and did willfully and maliciously deny me federal benefits and civil rights as a result of my refusal to provide my social security number.

232. I was harmed as a direct and proximate result by having to refrain from exercising my rights, the government suppressing dissent, and loss of public participation. I also experienced, as a direct and proximate result, the negative psychological and emotional impact of being threatened and the chilling effect that this had on the future exercise of my rights for fear of further abuse. I was harmed as a direct and proximate result by being deprived of my liberty for a period of time, being unable to do what I wanted or go where I wanted. I was harmed as a direct and proximate result by the delay of receiving federal benefits including food, drink, bedding, telephone, and restroom facilities that an inmate would normally enjoy.

233. Defendants' malicious, oppressive, and despicable conduct, carried out in a full and conscious disregard for my rights and safety entitles Plaintiff to punitive damages and penalties allowable under 42 U.S.C. § 1983 and Ohio and Nevada law in an amount sufficient to punish and deter such conduct.

**COUNT 25**

234. Plaintiff refers to paragraphs 1-104 of this Complaint and incorporates by reference the allegations of said paragraphs as though expressly set forth at length at this point.

235. Monell Failure to Train under the Ohio Constitution and Bill of Rights, the Nevada Constitution and Bill of Rights, U.S. Constitution, federal statute, state statute, and common law, against Ironton.

236. Defendant failed to properly screen, hire, train, instruct, monitor, supervise, evaluate, investigate, discipline and/or terminate defendants Pam Wagner, Brad Spoljaric, Chance Blankenship, Evan McKnight, Robert Fouch, and Does 1 to 7, with deliberate indifference to Plaintiff's constitutional rights in the following manner:

a. To fail to institute, require, and enforce proper and adequate training, supervision, policies, and procedures concerning engaging in defamation in retaliation of those exercising their First Amendment rights;

b. To fail to institute, require, and enforce proper and adequate training, supervision, policies, and procedures within the government entity concerning the fear experienced by people of different minorities (including cop watching activists) when interacting with government employees in light of well documented, highly publicized, and disproportionate amount of discrimination committed by government employees against said groups, and the tactics that employees should employ in dealing with said groups in light of such fears (especially where, as here, they have been explicitly made known to the employees);

c. To ignore and/or fail to properly investigate, supervise, discipline, and/or terminate employees who have engaged in unlawful or unconstitutional activities.

237. The totality of the circumstances of Ironton's consistent misconduct including against myself are indicative of a Monell failure to train liability. Discovery will show further proof.

238. I was harmed as a direct and proximate result by violations and those harms are enumerated in the separate claims for each primary claim.

235. Monell Failure to Train under the Ohio Constitution and Bill of Rights, the Nevada Constitution and Bill of Rights, U.S. Constitution, federal statute, state statute, and common law, against Ironton.

236. Defendant failed to properly screen, hire, train, instruct, monitor, supervise, evaluate, investigate, discipline and/or terminate defendants Pam Wagner, Brad Spoljaric, Chance Blankenship, Evan McKnight, Robert Fouch, and Does 1 to 7, with deliberate indifference to Plaintiff's constitutional rights in the following manner:

a. To fail to institute, require, and enforce proper and adequate training, supervision, policies, and procedures concerning engaging in defamation in retaliation of those exercising their First Amendment rights;

b. To fail to institute, require, and enforce proper and adequate training, supervision, policies, and procedures within the government entity concerning the fear experienced by people of different minorities (including cop watching activists) when interacting with government employees in light of well documented, highly publicized, and disproportionate amount of discrimination committed by government employees against said groups, and the tactics that employees should employ in dealing with said groups in light of such fears (especially where, as here, they have been explicitly made known to the employees);

c. To ignore and/or fail to properly investigate, supervise, discipline, and/or terminate employees who have engaged in unlawful or unconstitutional activities.

237. The totality of the circumstances of Ironton's consistent misconduct including against myself are indicative of a Monell failure to train liability. Discovery will show further proof.

238. I was harmed as a direct and proximate result by violations and those harms are enumerated in the separate claims for each primary claim.

239. Defendants' malicious, oppressive, and despicable conduct, carried out in a full and conscious disregard for my rights and safety entitles Plaintiff to punitive damages and penalties allowable under 42 U.S.C. § 1983 and Ohio and Nevada law in an amount sufficient to punish and deter such conduct.

## PRAYER FOR RELIEF

Plaintiff prays for damages as follows:

a. For compensatory damages in the amount of $100,000;

b. For punitive damages in the amount of $5,000,000 or in an amount sufficient to punish Defendants conduct and deter similar conduct in the future, pursuant to 42 U.S.C. § 1983.

c. For all applicable statutory penalties;

d. For attorneys' fees pursuant to 42 U.S.C. § 1988;

e. For costs of suit;

f. This Court declare what is lawful and unlawful in my factual allegations;

g. This Court order defendants to stop violating my rights;

h. Quash the restraining order from the bail requirements in the related criminal case;

i. For such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury.

## LR 7.1-1 CERTIFICATE OF INERESTED PARTIES

The undersigned, pro se party, certifies that the following may have a direct, pecuniary interest in the outcome of this case: pro-police organizations and individuals.

## DECLARATION OF JOSE MARIA DECASTRO

I declare under penalty of perjury, that the foregoing is true and correct.

239. Defendants' malicious, oppressive, and despicable conduct, carried out in a full and conscious disregard for my rights and safety entitles Plaintiff to punitive damages and penalties allowable under 42 U.S.C. § 1983 and Ohio and Nevada law in an amount sufficient to punish and deter such conduct.

**PRAYER FOR RELIEF**

Plaintiff prays for damages as follows:

a. For compensatory damages in the amount of $100,000;

b. For punitive damages in the amount of $5,000,000 or in an amount sufficient to punish Defendants conduct and deter similar conduct in the future, pursuant to 42 U.S.C. § 1983.

c. For all applicable statutory penalties;

d. For attorneys' fees pursuant to 42 U.S.C. § 1988;

e. For costs of suit;

f. This Court declare what is lawful and unlawful in my factual allegations;

g. This Court order defendants to stop violating my rights;

h. Quash the restraining order from the bail requirements in the related criminal case;

i. For such other and further relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury.

**LR 7.1-1 CERTIFICATE OF INERESTED PARTIES**

The undersigned, pro se party, certifies that the following may have a direct, pecuniary interest in the outcome of this case: pro-police organizations and individuals.

**DECLARATION OF JOSE MARIA DECASTRO**

I declare under penalty of perjury, that the foregoing is true and correct.

Dated: March 4, 2024

Respectfully submitted,

Jose DeCastro
1258 Franklin St.
Santa Monica, CA 90404
chille@situationcreator.com
(310) 963-2445
*Pro Se*